500

Philadelphia *v.* Human Relations Commission.

Argued October 5, 1972, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Albert J. Persichetti,* Deputy City Solicitor, with him *John Mattioni,* Deputy City Solicitor, and *Martin Weinberg,* City Solicitor, for appellant.

*Stanton W. Kratzok,* Assistant General Counsel, with him *Roy Yaffe,* Acting General Counsel, for appellee.

OPINION BY JUDGE CRUMLISH, JR., January 31, 1973:

The City of Philadelphia, in operating its Youth Study Center, has traditionally restricted the super-

vision of its wards to those who were of the same gender.

The Commonwealth's Human Relations Commission in liberally assigning its ideals to given cases has decided that there is no merit to the City's contention that the circumstances in this particular instance justify allowance of a Bona Fide Occupational Qualification (BFOQ), for its supervisors.

Hence this appeal.

To avoid a charge of sexual discrimination under the Pennsylvania Human Relations Act,[1] the City on April 13, 1970, requested the Commission, in writing, to grant it BFOQ, relating therein the unusual nature of the job responsibility.

The following recorded events are pertinent.

On April 30, 1970, the Commission requested additional information in the form of job descriptions and outlines of typical work assignments. Job specifications issued by the Civil Service Commission of the City of Philadelphia for the positions of Youth Center Supervisor I, Supervisor II, Youth Center Night Superintendent, and Youth Center Head Supervisor were then forwarded to the Commission.

On May 21, 1970, the Commission granted the City authority to make a selective certification for the position of Youth Center Supervisor I because of certain physical dangers "unique to this position that may endanger the health and safety of female employees" if females were hired to supervise male juveniles.

The City on September 30, 1970, asked the Commission to grant a BFOQ for the position of Youth Center Supervisor II and Youth Center Head Supervisor. These job assignments are the promotional level positions for Youth Center Supervisor I for which a BFOQ

---

[1] Act of October 27, 1955, P. L. 744, as amended, 43 P.S. §§951 et seq.

had already been granted. A letter dated December 4 extended the request for BFOQ to Youth Center Aide.

On March 12, 1971, the Commission informed the City that formal guidelines had been adopted by the Commission to aide in implementing the provisions of the Pennsylvania Human Relations Act, and in order for the City to retain its BFOQ for Youth Center Supervisor I and to gain any further exemption for the promotional level positions of that classification, new requests supported by proper justification were required.

The City, in a letter dated March 29, 1971, formally renewed its request for a BFOQ for Youth Center Supervisor I and its promotional levels. Included with this request was a letter of justification from the Executive Director of the Youth Study Center which purported to detail the Center's juvenile housing procedure and some of the problems attendant thereto. The letter of justification suggested certain factors which the Director felt necessitated a BFOQ to limit female supervision to female juveniles, and male supervision to males. The Executive Director also asked for an opportunity to personally present to the Commission its case if indeed the Commission felt the Executive Director's letter of justification was inadequate.

On April 8, 1971, the Commission withdrew its approval of a BFOQ for the position of Youth Center Supervisor I and denied the City's subsequent and extended requests for exemptions for the promotional levels of that position. The Commission did give the Executive Director the opportunity to personally appear before the Commission and elaborate his position. The record leaves us without the reason he chose not to appear.[2]

---

[2] At first blush, it might appear that our decision in *McKinley v. State Board of Funeral Directors*, 5 Pa. Commonwealth Ct. 42,

The City contends that the Commission misinterpreted the intent of the Legislature when it created the BFOQ exemption by confusing it with the anti-discrimination hiring provisions of the Human Relations Act.

The City's broad brush argument is inacceptable. However, we do agree that in the instant factual posture, the Commission should have granted the BFOQ exemption to the City so that it should engage only females to supervise female detainees at the Center and only males to supervise male detainees.

Section 5 of the Human Relations Act, 43 P.S. §955 (see footnote 1, supra), provides: "It shall be an unlawful discriminatory practice, *unless based upon a bona fide occupational qualification* . . . (a) For an employer because of the . . . sex . . . of any individual to refuse to hire or employ or to bar . . . from employment such individual . . . or to otherwise discriminate against such individual with respect to . . . hire . . . if the individual is the best able and most competent to perform the services required. . . ." (Emphasis supplied.)

The Pennsylvania Human Relations Commissions, which is created by the Human Relations Act to carry out its provisions, has promulgated regulations outlining when and through what procedures a "bona fide occupational qualification" will be granted. These regulations provide in part:

"§6 Bona Fide Occupational Qualifications.

---

288 A. 2d 840 (1972), dictates a quashing of this appeal for lack of an appealable adjudication. However, *McKinley* is clearly distinguishable from this case.

In *McKinley*, the State Board of Funeral Directors merely answered a written inquiry as to what actions the Board would take in a certain situation. This "advisory opinion" is clearly distinguishable from a decision of the Human Relations Commission denying a BFOQ after the City had followed the procedures outlined by the Commission to secure such an exemption.

"(A) §5 (of the Human Relations Act, see quoted above) provides that the Act shall not apply if the practices defined as unlawful are based on a *bona fide occupational qualification*. Such exemptions from the coverage of the Human Relations Act are not to be granted liberally but they will be given in appropriate cases.

"The procedure for securing such exemptions is to write to the Commission requesting a bona fide occupational qualification exemption and stating:

"(1) The jobs involved by title, number of positions, and duties, demonstrating why *all* persons of one sex cannot perform the functions of the job.

"(2) The reasons for requesting the exemption.

"(3) The length of time for which the exemption is desired.

"(4) The appropriate references to the United States Equal Employment Opportunity Commission guidelines, regulations or decisions." (Emphasis supplied.)

The City attacks the language promulgated by the Commission in §6(A)1 which requires the demonstration that "all persons of one sex cannot perform the functions of the job" before a BFOQ will be granted. The City argues that the Legislature intended the term "bona fide occupational qualification" to be a meaningful, albeit a restricted exemption, and this is impossible if the Commission's interpretation is accepted. The City also contends that the Legislature in using the term "bona fide occupational qualification" sought to comply with, and incorporate the interpretation given that same term in the Federal Government's Equal Employment Opportunity Act, the Act of July 2, 1964, 78 Stat. 253, USCA 2000(e) et seq., as amended.

We agree that this in fact was the intent of the Legislature. However, it is not altogether clear that

any other interpretation was ever given to the term "bona fide occupational qualification." There is language in the Commission's published regulation (Section 6) which could be read to conclude that in order for a BFOQ to issue it must be demonstrated that "all persons of one sex cannot perform the functions of the job." Such an interpretation, however, would be in conflict with the meaning given that term under the Equal Employment Opportunty Act.[3] The language in the correspondence between the appellee and appellant indicates that the Commission is following the federal executive and federal judicial orders in the interpretation of this important exception, but it disagrees with the City in its application of the Equal Employment Opportunity Commission's interpretation of BFOQ to the facts herein involved.

Being mindful of the erroneous position of the Commission, we hold that the language used by the Pennsylvania Legislature in providing the "bona fide occupational qualification" exception demonstrated that it intended this term to be synonymous with, and interpreted in like manner as that same term is used in the Equal Employment Opportunity Act.[4] This is the only reasonable, workable method, through hand-in-hand working of the state and federal government, that will carry us to a practical interpretation of this important exception.

The question then remains: Is the City of Philadelphia entitled to a bona fide occupational qualification (sex exemption) for Supervisors of the Youth Study

---

[3] The Federal standard that must be met in order to secure a BFOQ is whether "all or substantially all women" could perform the task. *Weeks v. Southern Bell Tel. & Tel. Co.*, 408 F. 2d 228, 235 (5th Cir. 1969). This standard, first promulgated in *Weeks*, will be thoroughly discussed in the remainder of this opinion.

[4] See *Philadelphia v. Human Relations Comm.*, 4 Pa. Commonwealth Ct. 506, 287 A. 2d 703 (1972).

Center, as it has been interpreted and defined by the Federal Courts?

The Commission urges us to allow that the City of Philadelphia has failed to prove that "all or substantially all women" would be unable to perform the tasks required of a Supervisor at the Youth Center. It argues that the letter of justification for the BFOQ is without factual basis and it contained multitudinous preconceptions, subjective evaluations, and commonly held assumptions about our sisters.

The Executive Director's letter of justification described the type of children housed at the Center as follows: "[r]outinely, juveniles ordered detained at the Center range in age from seven to sixteen and older juveniles are on occasion, included in the population. . . . All manner of police charges against them are included; aggravated assault and battery, assault with intent to ravish, assault with intent to kill, and murder. . . ."

It further described the assignments a woman supervisor would be required to perform if she were in charge of male detainees. "Daily showers, for example, must be directly observed with the group moving about the living unit in varying degrees of undress. Conducting a search of the person for contraband, etc., when necessary would be a very difficult assignment for a woman. . . ."

If the BFOQ is not granted, males would have to be hired (if qualified) to supervise girls housed at the Center.[5] The Executive Director feared that the girls

---

[5] The battlelines drawn by partisan activists in juvenile name calling skirmishes who refer to each other as male chauvinist, Women's lib, Ms., Miss or Mrs. fail to set the scene for sensible solutions to sex differences.

The furtherance of one side against the other can and does result in insidious invasion of the rights of the prevailing side. To say that females must be employed to supervise males is to say

would make "charges of molestation or other immoral acts . . . for the sheer sake of harassment," thus making an already very difficult administration of the Center an impossibility.

Discrimination in hiring for any reason is evil and should be vigorously attacked by the Pennsylvania Human Relations Commission. We agree that the Commission should exert careful scrutiny of the reasons advanced to support a BFOQ exception. However, the zeal of the Commission to eliminate all discrimination has caused it in this case to lose sight of commonsense principles and the potential consequences of the situation.

The federal example in this area, as it has evolved from statutes and court interpretations, provides enlightenment. The promise of Title VII of the Civil Rights Act of 1964 is that women are to be placed on equal footing with men in the pursuit of employment. *Weeks v. Southern Bell Tel. & Tel. Co.*, 408 F. 2d 228, 236 (5th Cir. 1969). Section 703(A) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e)-2(A) and Section 5 of the Human Relations Act, 43 P.S. 955, provide that it shall be an unlawful discriminatory practice for an employer to refuse to hire or otherwise discriminate against an individual because of such individual's sex.

Discrimination occurs when a "male employee may be appointed to a particular position on the showing that he is physically qualified, but a female is denied to demonstrate personal physical qualification." *Rosenfeld v. Southern Pacific Company*, 444 F. 2d 1219, 1225 (9th Cir. 1971).

However, discrimination which is based purely on sex classification is permitted when sex is a "bona fide

that males must be hired to supervise females. This is the insidious result which the Commission is unconsciously approaching.

occupational qualification." Such an exception to the mandate of equality in hiring should be interpreted narrowly, Equal Employment Opportunity Commission Guidelines, 29 C.F.R. §1604.1(A), and the "employer has the burden of proving that he had reasonable cause to believe, that is a factual basis for believing, that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved." *Weeks v. Southern Bell Tel. & Tel. Co.,* 408 F. 2d 228, 235 (5th Cir. 1969).

Federal cases dealing with BFOQ exception have placed a heavy burden on the employer to show clear justification before such an exception is granted. *Weeks v. Southern Bell Telephone, supra; Rosenfeld v. Southern Pacific Company, supra; Local 246 Utility Workers Union of America, AFL-CIO v. Southern California Edison Company,* 320 F. Supp. 1262 (C.D. Cal. 1970).[6]

However, careful research leads us to conclude that a BFOQ exception is not impossible to obtain. In *Rosenfeld,* the Court of Appeals for the Ninth Circuit states "[b]ased on the legislative intent and in the Commission's interpretation, *sexual characteristics,* rather than characteristics that might, to one degree or another, correlate with a particular sex, must be the basis for the application of the BFOQ exception." 444 F. 2d at 1225.

The Equal Employment Opportunity Commission's published Guidelines permit a BFOQ "where it is necessary for the purpose of authenticity or genuineness, the Commission will consider sex to be a bona fide occupational qualification, e.g., an actor or actress." 29 C.F.R. §1640.1.

---

[6] These cases deal almost exclusively with an employer's attempt to use state labor laws restricting the lifting of weight for women as a basis for a BFOQ. Clearly these cases are quite different from the factual situation herein involved.

Finally, the Court in the *Southern California Edison* case said, "By its decision, this Court does not mean to suggest that all rules restricting certain types of employment to one sex are invalid under Title VII of the Equal Employment Opportunities Act. *Such restrictions can be made where sex is relevant.*" 320 F.S. at 1265.

There is no question that a woman is equally qualified (or disqualified) to conduct a search for contraband as well as is a man. However, the vital factor that the Commission here disregards is "who are the people being searched?" If sex is not "relevant" in the supervision of children who range in age from seven to sixteen in various stages of undress, where can it be?

To subject a girl in this age group to a thorough search of her body by a male supervisor could cause not only a temporary traumatic condition, but also permanent irreparable harm to her psyche. It is no different where females supervise male juveniles. To have a woman supervisor observe daily showers of the boys at a time in life when sex is a mysterious and often troubling force is to risk a permanent emotional impairment under the guise of equality.[7]

The children at the Youth Study Center have a history of troubled and varied backgrounds. Emotional and social problems are the rule and not the exception.

---

[7] The Commission suggests that no *facts* were adduced by the City in support of its contention that personal contact under very intimate circumstances must be limited to contacts between persons of the same sex. Once again, the Commission seeks *facts* in an area where *facts* are not available. Laws forbidding discrimination in hiring on the basis of sex do not purport to erase all differences between the sexes. These laws recognize that there are jobs for which one sex is inherently and biologically more qualified than those of the opposite sex. The biological difference between men and women which in turn produce psychological differences are the facts that justify limiting personal contact under intimate circumstances to those of the same sex.

It is the role of the Supervisor to gain the confidence and the respect of the children in order to aid them in regaining a proper perspective of the trying problems of growing up in a dangerous, hostile, competitive world. The Commission cannot expect the City to produce cold, empirical facts to show that girls and boys at this age relate better to Supervisors of the same sex. It is common sense that a young girl with a sexual or emotional problem will usually approach someone of her own sex, possibly her mother, seeking comfort and answers. For girls in the Youth Center, their Supervisors are their only advisors. A like situation prevails for the boys. To expect a female or a male supervisor to gain the confidence of troubled youths of the opposite sex in order to be able to alleviate emotional and sexual problems is to expect the impossible.

This is clearly a situation in which the sexual characteristics of the employee are crucial to the successful performance of the job. The Commission has failed to delineate the difference between discrimination based on sex, and the situation where sex and certain inherent biological traits are essential to the performance of a task.

The Commission in its ardor to correct discrimination in hiring based on sex has failed to give proper weight to the rights and the tremendous needs of those housed in the Youth Center. This is not a situation where one's rights may be abridged to facilitate prison discipline and operation. The ultimate goal of the Center is to restore these children to society with a mental attitude which will allow them to function in a way beneficial to themselves and society. The right of these children to proper supervision is paramount. Therefore, it is paramount that these children be afforded every feasible individual right, including the right of privacy, which very well may be invaded if members of the oppo-

site sex are permitted to inspect nude children housed at the Center.[8]

We agree that the City of Philadelphia did not produce an abundance of evidence in support of its application for a BFOQ and that it failed to follow up on the invitation it had to appear personally before the Commission. In a case of this importance, the City should have used all available methods to place relevant considerations before the Commission.

However, the City did follow the procedure published by the Commission. (Section 5, cited above.) If the Commission felt additional evidence was needed before it could reach a decision that was fair to all parties involved, it should have required production of all relevant evidence.[9] We willingly recognize the Pennsylvania Human Relations Commission's fight against any kind of employment discrimination. *See Pittsburgh*

---

[8]*Griswold v. Connecticut*, 381 U.S. 479 (1965), recognizes certain individual rights not specifically enumerated within the Bill of Rights. Having one's body inspected by members of the opposite sex may invade that individual's most fundamental private right, the right of privacy of one's own body. Once again we realize that the Youth Center is situated in the posture of a disciplinary facility, and that individually guaranteed rights may be compromised for the purpose of discipline and supervision. However, in light of the goal of the Center to restore children to productive lives, every consideration should be given to the rights and needs of the detainees.

[9] We know that an employer has the burden of proving that he is justified in receiving a BFOQ exemption. *Weeks, supra.* However, the Pennsylvania Human Relations Commission, as an arm of the Commonwealth of Pennsylvania, should take all steps available to secure a just decision. The letter from the Commission, dated April 8, 1971, which denied the BFOQ exemption to the City was phrased in conclusionary terms, and this, no doubt, discouraged the Executive Director of the Center from personally appearing before the Commission. The wiser course for the Commission would have been to withhold final disposition of the matter until the Executive Director appeared before them.

*Press Employment Advertising Discrimination Appeal,*
4 Pa. Commonwealth Ct. 448, 287 A. 2d 161 (1971).[10]
We also agree with the Commission and the decisions
of our brothers in the Federal Judicial structure which
discard as empty rhetoric attempts to justify discrim-
ination against women by using the time-honored saw—
"weaker sex."

We are indeed naive, however, if we fail to recog-
nize that there are certain employment opportunities
wherein biological and physical construction of the
employee are crucial to the successful performance of
the job. This is such a case.

## ORDER

AND Now, this 31st day of January, 1973, it is here-
by ordered that the Pennsylvania Human Relations
Commission grant a Bona Fide Occupational Qualifica-
tion exemption to the City of Philadelphia for the posi-
tions of Youth Center Supervisor I, Youth Center
Supervisor II and Youth Center Head Supervisor.

Judge WILKINSON concurs in the result only.

---

DISSENTING OPINION BY JUDGE BLATT:

This case presents a prime example of the problems
which result when an appeal is permitted from an ad-
ministrative action which does not in fact amount to an
adjudication. As the majority opinion makes clear, the
record in this case is made up solely of a few letters
between the City of Philadelphia (City) and the Penn-
sylvania Human Relations Commission (Commission).

---

[10] It should also be noted at this time that this Court in
*Pittsburgh Press Employment Advertising Discrimination Appeal*
recognized the BFOQ exemption as a proper method of determining
when supposed differences between men and women really go to
those innate, biological differences which justify hiring on a sexual
distinction basis.

The sole bit of "evidence" is a listing of the specifications for some of the job categories here at issue.

It appears that when the Commission responds to a request for a Bona Fide Occupational Qualification (BFOQ), it takes no administrative action which amounts to an appealable adjudication, and there is actually nothing in the Pennsylvania Human Relations Act, Act of October 27, 1955, P. L. 744, as amended, 43 P.S. §§951, et seq., which authorizes the Commission to consider what is a BFOQ as an adjudicatory function except when a complaint charging a Section 5 (43 P.S. §955) discriminatory practice is filed. The procedures by which the Commission is to make an adjudication are spelled out in Section 10 of the Act, 43 P.S. §960, but the communications between the parties in this case in no way approximate those procedures. Moreover, the only statutory provision for an appeal from a decision of the Commission is contained in Section 10, and this procedure is not available until after the stages listed therein have been followed.

It seems clear that the action of the Commission in granting or denying a BFOQ is merely an advisory opinion, and that, if an employer chooses not to follow the Commission's direction he appears to be under no threat of any enforcement action being taken against him unless a complaint is subsequently filed against him as provided in Section 9 of the Act, 43 P.S. §959. Even this, however, is something which can be done whether the Commission has made a prior BFOQ decision or not. The situation in this case is virtually identical to that in *McKinley v. State Board of Funeral Directors,* 5 Pa. Commonwealth Ct. 42, 288 A. 2d 840 (1972), wherein we quashed the appeal.

The majority has attempted to distinguish *McKinley* from this case on the basis that Mr. McKinley merely addressed a written inquiry to the Board of Funeral Directors asking what action the Board would take in

a given situation. In this case, however, it is held that the City followed certain "procedures" prescribed by the Commission and so, presumably, did something more than was done in *McKinley*. Even a cursory view of these "procedures" shows that they involved merely a written request by the City to the Commission to make known its attitude on the propriety of a BFOQ for their employees, which was the same type of request as made in *McKinley*. Obviously, the Commission's expression of opinion was merely advisory and can have no real effect until and unless someone files a complaint with the Commission charging a Section 5 discriminatory practice against the City as the party seeking the BFOQ. The Human Relations Act makes it clear that the issue of whether or not a BFOQ should be granted is to be decided when a Section 5 complaint is filed, and, at that time it is provided that an appeal may be filed from a grant or a denial of a BFOQ. In my opinion, this Court should not permit an appeal where there is no statutory provision for an appeal at this stage of the proceedings.

I believe that this appeal should also have been quashed.

Inasmuch as the majority has decided to let the appeal stand, however, I must still dissent from some of its findings.

I do agree with the majority's holding that the proper standard when considering the award of a BFOQ is whether or not all, or substantially all, the members of a particular sex can qualify for the job in question. Also, as applies specifically to this case, it is reasonable to hold that, when dealing with young people between seven and sixteen who are in various states of undress, it is certainly reasonable to have supervisors of the same sex present, because of the psychological problems which may be involved for the children. I must reject, however, any implication in the

majority opinion to the effect that all or substantially all women cannot handle security or counseling problems for the boys, as distinct from supervising them in the washrooms. The same holds true for men supervisors dealing with the girls.

The lack of "evidence" is the most troublesome aspect of this case. As this Court has stated in *Pittsburgh Press Employment Advertising Discrimination Appeal,* 4 Pa. Commonwealth Ct. 448, 465, 287 A. 2d 161, 170 (1972), quoting *Weeks v. Southern Bell T. & T. Co.,* 408 F. 2d 228, 236 (1969) : "We conclude that the principle of non-discrimination requires that we hold that in order to rely on the bona fide occupational qualification exception, *an employer has the burden of proving* that he had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved." (Emphasis added.) Because of the questionable procedural aspects of this case, virtually the only attempt made by the City to carry its burden of evidence was in mailing a set of job specifications to the Commission. (Apparently the majority did not grant a BFOQ for the job of the Youth Center Aid, as requested by the City, because there was no description of such job among the specifications.) A glance at these specifications, however, indicates that the jobs of Youth Center Supervisor I and II involve dealings with the children when they are in various states of undress only to a minimal extent. Examples given regarding typical work for a Youth Supervisor I are as follows:

"Supervises children in a variety of activities within the institution such as dressing and grooming in the mornings, proper eating at meal times, cleaning living units or performing other custodial assignments, traveling to and from school, court, dispensary or other areas,

participating in group play activities in indoor and outside areas.

"Maintains order and discipline at all times administering discipline when required according to prescribed procedures.

"Inspects living unit periodically, in the interest of security, to check for contraband, escape attempts or emotional disturbances of children.

"Fills out simple processing and medical forms, progress reports on the behavior, and attitude of children; makes up resident lists, keeps count of clothes issued and returned; maintains log of unit.

"Performs related work as required."

The duties of a Youth Supervisor II are similarly described, but in addition, he or she: "Supervises counselors in the absence of the head supervisor; assigns tasks and checks each unit; assists head supervisor by acting as relief or extra man when needed to transfer individuals or oversee groups of children."

It is possible that the City is unable to separate those activities which reasonably should only be performed by someone of a specific sex from the numerous other activities which may be performed by any otherwise qualified person. But are we merely to guess at the answer? And is it not reasonable to suppose that the City could categorize and classify the duties of particular employees more specifically if it had a better job classification plan? In any event, should not the burden be on the employer to justify any suspect classification? The City might easily have shown that it would be inefficient or uneconomical to have separate job classifications for those employees, here grouped into a very generalized classification, who are dealing intimately with the children on a regular basis, and those others, in the same generalized classification, who have a merely supervisory, custodial or instructional job. But it has not done so.

An even more blatant example of a lack of evidence concerns the position of Youth Center Head Supervisor. The examples of work given for that job are:

"Assigns counselors to groups of children; plans weekly schedules of work; makes periodic checks of the work of the counselors for conformance to regulations and specific instructions; advises and instructs the counselors in regard to problems in their groups; meets with superiors and takes part in in-service training program; instructs counselors in the principles and procedures discussed at such meetings.

"Transfers groups of children to different areas such as the cafeteria, school rooms or gymnasiums; counsels children with behavioral problems; checks living areas for cleanliness, security and for the presence of contraband articles.

"Performs related work as required."

Clearly a Youth Center Head Supervisor's primary duties are supervisory and his or her contact with the children is minimal. There is nothing in the job specifications or in any of the City's letters which avers that a Youth Center Head Supervisor has contact with the children when they are in states of undress. Even in searches for contraband, which seemed to trouble the majority, the specification states that a Youth Center Head Supervisor searches "living areas." There is nothing which states that he or she would conduct a search of the person. There was simply no evidence produced by the City, and none cited by the majority, which would in any way indicate that the job of Youth Center Head Supervisor could not be performed by either a man or a woman.

The fact that no adjudicatory procedures were followed in this case made it extremely difficult for the City to present any real evidence as to the propriety of its job classifications or as to the need for a person of a specific sex to fill a given position. The majority,

however, has chosen to ignore this lack of evidence. Perhaps the majority is acting correctly in granting a BFOQ for each position, but, given the almost complete lack of information, I do not believe it proper to find that the City has really carried its heavy burden of evidence.

It might be suggested that the underlying problem here for the City may well be in its job classification pattern. If its job specifications related more specifically to the exact duties of the particular employees concerned, who might individually be accurately described, perhaps, as instructors, counselors, guards, record keepers or by any other title reflecting their actual and usual occupations, it would be easier to determine for which, if any, a BFOQ was justified. To group all employees under such a generalized classification as "Youth Center Supervisor," however, infers that *all* of them normally perform *all* of the duties listed, and tells nothing about their actual individual assignments. Moreover and more importantly, it gives no indication as to whether or not there might be discrimination in employment of such employees, if applicants of one sex or the other are denied consideration for appointment or promotion.

I would prefer to quash this appeal. In the alternative, I would find that the City has simply failed to introduce sufficient evidence to carry the burden it must carry to be entitled to a BFOQ and deny the appeal for that reason.