606 A.2d 1287

**LIVINGWELL (NORTH) INC. and Four Corners Health Clubs (Penn/Del), Inc., Petitioners,**

**v.**

**PENNSYLVANIA HUMAN RELATIONS COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 11, 1991.

Decided April 7, 1992.

Jonathan D. Westchler, for petitioners.

Michael Hardiman, Asst. Chief Counsel, for respondent.

Before CRAIG, President Judge, and DOYLE, COLINS, PALLADINO, McGINLEY, SMITH and PELLEGRINI, JJ.

PELLEGRINI, Judge.

LivingWell (North), Inc. and Four Corners Health Clubs (Penn/Del), Inc. (collectively referred to as LivingWell) appeal from a decision and final order of the Pennsylvania Human Relations Commission (Commission), which determined that LivingWell had violated and continued to violate Section 5 of the Pennsylvania Human Relations Act (Act),[1] by refusing to admit men to their all-women health club facilities, and ordered LivingWell to cease and desist discrimination on the basis of sex with respect to those facilities.

On July 27, 1984, the Commission filed a complaint against Elaine Powers Figure Salons (Elaine Powers) alleging that Elaine Powers violated the Act by excluding men from membership in its fitness clubs and by failing to consider men for employment in certain positions.[2] The Commission filed this complaint, even though they had not received any complaints from men alleging discrimination by Elaine Powers. After an investigation of the allegations in December of 1984 and finding probable cause, the Commission attempted to resolve the matter through conference, conciliation and persuasion, but was unable to do so. In May of 1985, the Commission notified Elaine Powers that a public hearing had been approved.

Prior to the hearing, in March of 1985, Elaine Powers was acquired by Houstonian, Inc., which changed its name to LivingWell, Inc. LivingWell, Inc. is the parent company of LivingWell (North), Inc., which owned and operated the fitness facilities acquired by Houstonian until October 11, 1989. At that time, Four Corners Health Clubs (Penn/Del), Inc., a subsidiary of LivingWell, Inc., became the owner and

1. Section 5 of the Act, Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. § 955(i)(1).

2. Because LivingWell changed Elaine Powers' policy at the Commission's behest of only hiring female employees, the Commission did not pursue the employment related allegations in its complaint.

operator of the facilities.[3] Both LivingWell and Four Corners were named as parties in the complaint at the time of the hearing before the Commission.

At the Commission hearing, LivingWell argued that women have a right to exercise in an all-female environment, and that a woman's right to privacy is consistent with the Act's recognition that discriminatory conduct otherwise illegal is permissible to the extent that membership within a particular class of individuals constitutes a bona fide occupational qualification (bfoq). The Commission, however, determined that the bona fide occupation qualification is an exception that applies only to employment matters, and is not normally warranted in a situation involving customer preference unless associated with recognized privacy rights. The Commission further determined that there was no recognized privacy right regarding exercising, and Living-Well was discriminating based on gender in violation of the Act. The Commission then ordered LivingWell to cease and desist discrimination on the basis of sex regarding its membership. LivingWell filed the present appeal from that order.

The issue now before us is whether a privacy right exists as an exception to Section 5 of the Pennsylvania Human Relations Act, which would permit the exclusion of all men from an all-women's exercise facility.

Section 5 of the Act, 43 P.S. § 955, provides the following: It shall be unlawful discriminatory practice, unless based upon a *bona fide occupational qualification* ....

(i) For any person being the owner, lessee, proprietor, manager, superintendent, agent or employe of any place of public accommodation, resort or amusement to:

(1) Refuse, withhold from, or deny to any person because of his race, color, *sex*, religious creed, ancestry,

---

**3.** Of the sixteen facilities owned by Four Corners Health Clubs, ten are available for use by females only, four are available for use by both males and females on an alternating basis, and two are strictly coed. None of the facilities provide a snack bar, juice bar or restaurant area where networking takes place between members.

national origin or handicap or disability.... any of the accommodations, advantages, facilities or privileges of such place of public accommodation, resort or amusement.[4]  (Emphasis added).

One of the bfoqs the courts have recognized is that there are certain situations involving the individual sexes that warrant the exclusion of the opposite sex for privacy reasons.  The courts have referred to these cases as "customer preference" cases because the desires of the customers and not the employees or employers are at issue.  Because the relationship between the customer and the charged party are so intertwined, that relationship entitles the charged party to raise the privacy defense.  *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Backus v. Baptist Medical Ctr.,* 510 F.Supp. 1191 (1981).

However, while the term "customer preference" describes the defense as it relates to the reason a business is advancing it as a defense to gender-based discrimination, it is misleading in that it seems to imply that this defense can be advanced against a charge of discrimination involving some other protected class when it cannot.  Rather than being denominated "customer preference" defense, a more accurate description is "customer gender privacy" to reflect the basis for the defense and its availability to only a charge of gender discrimination and no others.  This defense recognizes a pervasive public policy that certain conduct that relates to and between genders is inappropriate.  For example, it is a misdemeanor to commit open lewdness because those who observe it "would be affronted or alarmed."  See 18 Pa.C.S. § 5901.  Similarly, sexual harassment prohibits the creation of a hostile environment as a result of pervasive sexually based words and conduct, mak-

---

**4.**  Section 4 of the Act, 43 P.S. § 954(*l*), provides in part that the term "public accommodation, resort or amusement" means any accommodation, resort or amusement which is open to, accepts or solicits the patronage of the general public.  In this case, because the parties have stipulated that membership for use of the facilities is open to the general public, there is no question that the LivingWell facilities are places of public accommodation for purposes of the Act.

ing working difficult because of the uncomfortableness a person experiences as a result of such conduct. See Section 703 of Title VII of the Civil Rights Act of July 2, 1964, 42 U.S.C. § 2000e–2.

To establish a "customer gender privacy" defense in an employment situation, the federal courts have developed a three-prong test that a charged party must satisfy. A business must establish a factual basis for believing that not excluding members of one sex would undermine its business operation; that its customers' privacy interests are entitled to protection under the law; and that no reasonable alternative exists to protect the customers' privacy interests. *U.S. E.E.O.C. v. Sedita*, 755 F.Supp. 808 (1991).

■ Because this privacy defense legitimizes certain gender-based discrimination, it is an extremely narrow one and is not based upon the consideration of whether customers desire that either gender perform certain preconceived roles. Rejecting a claim by an airline that male customers preferred the employment of female flight attendants, the Fifth Circuit in *Diaz v. Pan American World Airways, Inc.*, 442 F.2d 385, (5th Cir.1971) held:

> While we recognize that the public's expectation of one sex in a particular role may cause some initial difficulty, it would be totally anomalous if we were to allow the preferences and prejudices of the customers to determine whether sex discrimination was valid. Indeed it was, to a large extent, these very prejudices the [1964 Civil Rights] Act was meant to overcome. Thus, we feel that customer preference may be taken into account only when it is based on the company's inability to perform the primary function or service it offers.

Unlike the "customer preference" advanced in *Diaz*, those cases which have recognized customer gender privacy as a defense are based on the customer's expression of a legitimate privacy interest. The privacy interest expressed involves situations where the customers, due to modesty, find it uncomfortable to have the opposite sex present because of the physical condition in which they find them-

selves or the physical activity in which they are engaged as customers at the business entity. These customers would be embarrassed or humiliated if cared for or observed by members of the opposite sex.

Typical of the cases upholding such a defense to gender discrimination is *City of Philadelphia v. Pa. Human Relations Commission,* 7 Pa.Commonwealth Ct. 500, 300 A.2d 97 (1973). In that case, we found that customer gender privacy was a valid defense to not hiring staff members of the opposite sex to act as counselors in a male or female juvenile facility. We recognized that a juvenile's "privacy interest" would be violated if required to submit to a body search, disrobe and shower in front of a staff member of the opposite sex, and that juveniles would be better able to discuss emotional problems with someone of the same sex.

Cases brought under the substantially similar provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* have also recognized that there is a customer preference privacy right defense to gender-based discrimination. *See,* e.g., *Fesel v. Masonic Home,* 447 F.Supp. 1346 (D.Del.1978) *aff'd mem.,* 591 F.2d 1334 (3rd Cir.1979) (customer preference related to intimate privacy rights including dressing, bathing, toileting, geriatric pad changes and catheter care may justify a BFOQ); *Hodgson v. Robert Hall Clothes, Inc.,* 326 F.Supp. 1264, 1269 (D.Del.1971), *aff'd in relevant part,* 473 F.2d 589 (3d Cir.) *cert. denied,* 414 U.S. 866, 94 S.Ct. 50, 38 L.Ed.2d 85 (1973) (male gender is BFOQ for sales position in men's clothing store); *EEOC v. Mercy Hospital,* 28 EPD ¶ 32, 603 (W.D.Okla.1982) (desire for sexual privacy may give rise to BFOQ in delivery room nurse position where duties include undressing patient, examining vaginal area, inserting catheter, performing episiotomy); *Jones v. Hinds Gen. Hosp.,* 666 F.Supp. 933 (S.D.Miss.1987) (male gender is BFOQ for position of orderly where duties include catheterization of male patients and a significant number of men objected to being exposed to female nurse assistants); *Brooks v. ACF Indus.,* 537 F.Supp. 1122 (S.D.W.Va.1982) (male employees' rights

would be infringed upon by female janitors entering and performing duties in male bathhouse while men were using facility); *Backus v. Baptist Medical Ctr.*, 510 F.Supp. 1191 (D.C.Ark.1981) (need for personal privacy in labor room where intimate contact with constantly exposed genitalia justified BFOQ); *Norwood v. Dale Maintenance System, Inc.*, 590 F.Supp. 1410 (N.D.Ill.1984) (male gender is BFOQ for position of washroom attendant for men's washroom in office building).

Unique to this case is that the defense is not being advanced in an employment discrimination case, but rather in a public accommodation discrimination case. While all of these cases involve employment discrimination, the Commission concedes that where there is a distinctly private activity involving exposure of intimate body parts, there exists an implied bona fide public accommodation qualification which may justify otherwise illegal sex discrimination. Otherwise, as the Commission notes, such sex segregated accommodations such as bathrooms, showers and locker rooms, would have to be open to the public. Consequently, because the rationale and the policy reasons are the same, we will apply the same considerations to determine if a valid customer preference privacy right defense exists in response to charges of discrimination at a place of public accommodation.

### A.

█ In order to show a factual basis for excluding males from its all-female facilities, it was incumbent on Living-Well to establish before the Commission that admitting men would undermine its business operation. This factor is a type of market-place check on the validity of the claimed privacy interest. In cases involving employment discrimination, by showing that customers would not frequent the establishment if the opposite sex attended to them, it evidences that the customers' need for gender privacy is based on a sincere and honest belief that the right to privacy is so fundamental that they would not patronize that establish-

ment, and not merely a preference they have to see a certain gender perform a certain role. Similarly, in a public accommodation situation, the adverse effect of customer preference on the business operation verifies that justification for discrimination is based upon a strongly held belief rather than a preference of seeing one sex perform a certain role, but not so strongly that the customer would no longer frequent the establishment if members of the opposite sex were admitted.

Here, LivingWell offered uncontraverted testimony from customers and employees regarding the adverse effect that opening LivingWell's all-female facilities to men would have on its business. The customers all testified that the primary reason they chose LivingWell was that its facilities were for women only, and that they would cease coming to the particular facility if the club became coed. LivingWell employees testified that many women, upon joining the club, informed them that their primary reason for exercising at LivingWell, rather than other facilities, was because it was only open to women. Moreover, the President of LivingWell testified as well that there would be a substantial loss of membership if LivingWell was required to accept male customers.

Confirming these observations was the expert testimony of Dr. Robert Tanenbaum, a psychologist specializing in "appearance matters." Based upon interviews of LivingWell members, Dr. Tanenbaum testified that 50% of the members interviewed stated that exercising in an all-female environment was the decisive and primary reason for choosing LivingWell. Moreover, he testified that 82% of the members interviewed indicated that exercising in an all-female environment was an important factor, but not the only reason for choosing to join LivingWell.

Because no countervailing evidence was presented, the Commission was obligated to find that LivingWell's business would be undermined if it was required to accept male customers, and that maintaining all-female facilities was fundamental to its business.

## B.

In addition to proving that its business would be undermined by accepting male customers, LivingWell had to also establish that their female customers have a legitimate privacy interest in need of protection.  In examining whether the customer's privacy interest deserves protection, criteria similar to those used in determining whether a right to privacy exists are considered.  Generally, those cases that have dealt with whether a customer has a protected gender privacy interest have taken into consideration:

· the nature of the privacy interest involved;

· the nature of the activity being engaged in;

· the sincerity with which it is being advanced;

· the harm that will be caused to the person who will be affected by the application of a customer based preference defense;

· whether there is an overriding public policy reason not to recognize the privacy interest being advanced.[5]

LivingWell contends that their customers have a legitimate privacy interest in exercising in a single sex club because exercising focuses upon aspects of their figures which they wish to improve.  While doing the exercises to reshape their figures, they expose parts of the body about which they are most sensitive, assume awkward and compromising positions, and move themselves in a way which would embarrass them if men were present.

The Commission contends, however, that the nature of the privacy interest advanced here is not entitled to protection because no matter how awkward or compromising the position a person finds her or himself in while exercising, there is no protected privacy issue unless an "intimate area" of the body is actually exposed.  The Commission argues that customer "modesty" preferences not commonly

5.  The Commission, at pages 32 and 33 of its brief, have listed some of the identical factors used to determine whether a gender privacy interest exists.

held by society are irrelevant to justify a gender-based discrimination.

Simply because all the cases until now have discussed the exposure of or touching of "intimate areas" of the body does not mean that each gender lacks a privacy interest in all other situations. The problem in determining what is "protected" is that societal conduct in this area is not consistent or rational. What we believe is private, humiliates us or makes us uncomfortable comes from societal norms and standards of conduct. What is "acceptable" in that context is based on time, place and circumstances. For example, individuals who would wear generally acceptable revealing attire at the beach or pool would likely be totally humiliated to be seen walking down a public street in their much less revealing nightwear. What this indicates is that in relation to one's body, there are societal norms, i.e., a spectrum of modesty, which one either follows or respects, and if one is required to breach a modesty value, one becomes humiliated or mortified.

Privacy interests are especially protected involving a person's "body," clothed or unclothed. As this court stated in *City of Philadelphia,* 7 Pa.Commonwealth Ct. at 512, 300 A.2d at 103, n. 8:

> *Griswold v. Connecticut* recognizes certain individual rights not specifically enumerated within the Bill of Rights. Having one's body inspected by members of the opposite sex may invade the individual's most fundamental privacy right, the right of privacy of one's own body.

LivingWell's customers testified that they were sensitive about having men observe their bodies while exercising. If men saw them perform their exercises, they testified that they would feel self-conscious and uncomfortable about themselves and would not continue to be members of LivingWell. In uncontradicted testimony, Dr. Tanenbaum testified that it would be detrimental to these women to exercise in front of men:

> Psychologically it would be a very unhealthy experience because it would generate anxiety, shame, and embar-

rassment, and a painful level of self-awareness which is likened to the experience of feeling disfigured or disabled in the sense that one is exposed and vulnerable and there isn't a whole lot that can be done to alter the perception of the observer. It is a very difficult and stressful experience to be on the spot in that way.

(Reproduced Record at 182a–183a.)

Just because "intimate areas" of these women's bodies are not exposed does not mean that they do not have a privacy interest worthy of recognition.[6] The uncontroverted evidence is that if men were admitted, these women would suffer from extreme embarrassment, anxiety or stress and would not continue to exercise at LivingWell. The standard for recognizing a privacy interest as it relates to one's body is not limited to protecting one where there is an exposure of an "intimate area," but such a right may also be recognized where one has a reasonable basis to be protected against embarrassment or suffer a loss of dignity because of the activity taking place.

The Commission believes that the privacy interest is not justifiable and these women have no reasonable basis to feel embarrassed because society as a whole would not find it objectionable to exercise with the opposite sex. Privacy interests are not determined by the lowest common denominator of modesty that society considers appropriate. What is determinative is whether a reasonable person would find that person's claimed privacy interest legitimate and sincere, even though not commonly held. Nothing in the record supports nor does the Commission seriously challenge that these women do not sincerely hold these beliefs or that a reasonable person would not find these beliefs legitimate.

Even if a privacy right exists, whether that privacy interest is worthy of protection is determined by balancing

6. To hold otherwise would mean that separate changing rooms in factories, mines and construction sites where workers change from street clothes to work clothes and back and where "intimate areas" are not exposed, would not be permitted.

that interest against any harm caused to the excluded men. The only harm the Commission advances is that the men will not be allowed to exercise at certain LivingWell locations. However, the Commission admits that there are other facilities just as convenient where men can exercise in a coed environment. Unlike gender discrimination that would result in the non-hiring of males, or where an exercise establishment has other facilities where business or "networking" is conducted, no harm exists to any male by being excluded from LivingWell's facilities.

Although a privacy interest may exist, whether it is protected is determined by whether there is an overriding public policy that would outweigh that privacy interest. The exclusion of males from LivingWell's all-female facilities would result in no harm to men if a public policy existed in the Act requiring the inclusion of men, and that public policy would not overrule any "privacy interest," no matter how legitimate or sincere. While the Commission has not advanced any public policy reason for inclusion of males, other than "because males are excluded, *per se*, it is against public policy," this court has previously articulated the public policy behind laws outlawing gender-based discrimination in *City of Philadelphia:*

> Laws forbidding discrimination in hiring on the basis of sex do not purport to erase all differences between the sexes. These laws recognize that there are jobs for which one sex is inherently and biologically more qualified than those of the opposite sex. The biological difference between men and women which in turn produce psychological differences are the facts that justify limiting personal contact under intimate circumstances to those of the same sex.

7 Pa.Commonwealth Ct. at 510, n. 7, 300 A.2d at 103, n. 7.

The argument recognizing that a privacy interest to exercise in a single sex facility somehow patronizes women by impermissibly protecting them is both illogical and demeaning. It is illogical because at the base of that view is an ossified and stereotypical view that men do not share simi-

lar privacy interests—a view not warranted. It is also demeaning to those women who desire to exercise separately because they are somehow "weak" because they have developed a different sense of modesty than held by others. It infers that there is only one acceptable standard of behavior and any variation should not be tolerated or respected. That individuals can have different senses of modesty as to their bodies than others should be acknowledged if sincerely and reasonably held and where there are no countervailing interests.[7] No one is being protected in this case by recognizing this privacy interest because those who want to exercise in a unisex environment are free to do so. The only protection being afforded is the freedom to make that choice and for one to have a different sense of modesty than the Commission would like to impose.

Moreover, as the federal district court in *Backus,* quoting from *A. Larsen, Employment Discrimination–Sex,* § 1430 (3d Ed.1980), stated:

> It is necessary at this point to stress that the purpose of the sex provisions of the Civil Rights Act is to eliminate sex discrimination in employment, not to make over the accepted mores and personal sensitivities of the American people in the more uninhibited image favored by any particular commission or court or commentator. (Emphasis added.)

510 F.Supp. at 1195.

Because a legitimate privacy interest has been raised and there are no overriding considerations, LivingWell has es-

---

7. Just because LivingWell acceded to the Commission by employing men, admittedly with some limitation on their duties, the Commission contends that because men are now present, LivingWell can no longer argue that male customers should not be permitted based upon customer gender privacy. This contention ignores that an employee has a different relationship to the member than a male customer would have. An employee occupies a position of trust, can be monitored and is subject to termination. More importantly, privacy rights are not interconnected, but each claimed right is examined in a separate balancing test based upon the countervailing rights of the parties involved.

tablished that a protected privacy interest exists for women who want to exercise at an all-female facility.

## C.

Finally, in employment discrimination cases, even if a legitimate privacy interest exists, if the job duties can be modified to accommodate the privacy interest and still employ the gender claiming discrimination, then a BFOQ does not exist. Because it is impossible to allow men to be present while these women are exercising, and, at the same time protect their right to privacy, no reasonable alternative exists to protect LivingWell's customer's privacy interests while at the same time accommodating male members.

Accordingly, because LivingWell has established that a legitimate privacy interest exists and if disallowed would undermine its business operations and there would be no practical way to ameliorate its impact, the decision of the Commission is reversed.

## ORDER

AND NOW, this 7th day of April, 1992, the order of the Pennsylvania Human Relations Commission dated November 21, 1990, Nos. E–30106 and P–2099, is reversed.

PALLADINO, Judge, dissenting.

I respectfully dissent.

The majority concludes that there is a customer preference defense which justifies the unquestioned gender-based discrimination in this case. I respectfully note that the cases relied upon by the majority which uphold a customer preference defense to gender-based discrimination all involve an employment problem. Without a doubt, this case is a public accommodation problem, not an employment problem. This case concerns the participation by members of the public in an exercise program at a business establishment, not the hiring or firing of employees, or anything else associated with employment.

In recognition of the fact that the customer preference defense has only been applied to employment problems, the majority proposes to extend the customer preference defense to public accommodation problems upon a bona fide public accommodation qualification theory. This qualification "may justify otherwise illegal sex discrimination" and exists in places of public accommodation "where there is a distinctly private activity involving the exposure of intimate body parts...." Majority Opinion at 123. However, this case does not involve the exposure of intimate body parts. Rather, this case involves an activity, exercise, which is performed outside the home, in a group setting, and in full exercise attire. This activity, therefore, cannot be so "distinctly private" so as to justify the exclusion of all men from a public exercise facility based upon customer preference.

As the validity of the bona fide public accommodation qualification hinges upon the exposure of intimate body parts, so, too, does the customer preference defense. In all of the cases cited by the majority which uphold the customer preference defense, the exposure of intimate body parts creates a legitimate privacy interest. This legitimate privacy interest is what justifies the discrimination. Thus, to justify the discrimination in the present case, the majority attempts to create a legitimate privacy interest in exercise even though this activity does not involve the exposure of intimate body parts.

The majority attempts to legitimize exercise as a privacy interest through the testimony of several female LivingWell members and the testimony of Dr. Tanenbaum. The female members testified that they would no longer patronize the LivingWell facilities if the facilities became coed because they would be embarrassed to exercise in the presence of males. Dr. Tanenbaum testified that it would be psychologically detrimental for these women to exercise in front of men. The majority, based on this testimony, concludes that even though this interest in exercising in an all-female environment may not be commonly held, the interest is

nevertheless a legitimate privacy interest because it is sincerely held.

However, this privacy interest can neither be legitimate, nor the testimony relied on credible because males are in fact present at the facilities where these women exercise. At two out of the three facilities which the females who testified patronize,[1] men are employed in positions ranging from manager and service personnel to aerobics instructor. Stipulations of Fact, Exhibit D. In addition, Dr. Tanenbaum's testimony was based on the interview of eighteen female members from three different LivingWell facilities. At all three of these facilities, men are employed in positions such as manager, trainer, aerobics instructor and lifeguard. Stipulations of Fact, Exhibit D. The only job restrictions for these male employees involve the taking of measurements of the female members, unless consented to, and exclusion from the women's locker room. Stipulations of Fact, No. 85. Therefore, the majority's conclusion that gender-based discrimination is justified in this case because "it is impossible to allow men to be present while these women are exercising, and, at the same time protect their right to privacy" is totally at odds with the testimony in the record. Majority Opinion at 130.

As the above quote illustrates, the majority is striving to "protect" the supposed privacy interest of the female LivingWell members by perpetuating gender-based discrimination at these LivingWell facilities. However, what the majority is in reality perpetuating is an antiquated notion regarding the status of women in society. That antiquated notion was best articulated by President Judge Ludlow of the Court of Common Pleas of Philadelphia County in an 1884 case involving a motion for admission of a woman into the practicing bar. He stated in denying the motion:

[T]he Creator of the universe, for a reason which any reasonable being ought to consider self-evident, made a

---

1. Although there was no actual testimony from the Bala Cynwyd facility member, counsel stipulated that she would offer the same testimony as the other three members who testified.

distinction between the sexes, and saw fit in the propagation of the species to protect the physically weaker sex by laws as inflexible as other and general laws governing the universe, and to place under the protection of the male sex the female, simply because as a general and universal law applicable to all created living organisms the female requires protection.

*In re Application of Mrs. C.B. Kilgore,* 14 Wkly.Notes Cas. 255, 256 (1884).

Although we are now almost a century away in time from Judge Ludlow's statement, we are obviously not as far away in thought. Women have, over the past century, managed to cast off this "shield of protection" and have assumed roles in society equal to that of men's. But women cannot continue to maintain that equality when decisions such as this purport to "protect" women by keeping them separate, for separation is inherently unequal.

SMITH, Judge, dissenting.

If the extraordinary views espoused by the Majority and its creation of the "customer gender privacy" theory were permitted to represent the law of this Commonwealth, the compelling interest in combatting discrimination would be severely compromised which may once again rear its invidious head in places of public accommodation throughout the Commonwealth.

The legislature of this Commonwealth has declared in Section 2 of the Pennsylvania Human Relations Act, 43 P.S. § 952, that it shall be the public policy of this Commonwealth to eradicate wherever possible discrimination against persons or groups of persons which "undermines the foundations of a free democratic state"; and pursuant to Section 5 of the Act, 43 P.S. § 955, it shall be unlawful to discriminate under the circumstances in this case. Absolutely nothing in the language or intent of the Act or in any of the employment-related cases relied upon by the Majority can legitimately support the exception to the Act's prohibition which the Majority has carved out to justify discrimina-

tion in places of public accommodation. To extend a "privacy right" to a woman's purely voluntary and personal choice to exercise at LivingWell to reshape her figure is unquestionably outside the ambit of one of the most basic and fundamental principles of law.