**Gregory BACKUS, Plaintiff,**

v.

**BAPTIST MEDICAL CENTER, Defendant.**

**No. LR–C–79–445.**

United States District Court, E. D. Arkansas, W. D.

April 15, 1981.

Philip E. Kaplan, Kaplan, Brewer & Bilheimer, P. A., Little Rock, Ark., for plaintiff.

Byron Freeland, Mitchell, Williams, Gill & Selig, Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

ROY, District Judge.

Plaintiff Gregory Backus is an adult male who was graduated as a registered nurse

(R.N.) and certified by the State of Arkansas to perform nursing services in May 1978. At the time of his graduation he was already training as a student nurse at the Baptist Medical Center Hospital in Little Rock, Arkansas, assigned to the obstetrics and gynecology department (OB–GYN) of the hospital as a student nurse.

Defendant Baptist Medical Center is a private hospital incorporated pursuant to the laws of the State of Arkansas, and it provides extensive medical services, among which are gynecological and obstetrical care.

Defendant makes its facilities available to physicians practicing throughout the community. Currently there are eleven physicians who are actually involved in the delivery of babies, and of these eleven, two are female. Defendant also provides a support staff which includes nurses and orderlies.

On April 19, 1978, plaintiff Backus requested placement as a full-time registered nurse in the labor and delivery section of the OB–GYN department. On April 24, 1978, the Assistant Administrator of the Nursing Division refused his request. Plaintiff appealed to J. A. Gilbreath, Executive Director of the Baptist system, and was again refused. Plaintiff did begin work as an R.N. in the intensive care nursery, a part of the OB–GYN department.

On January 3, 1979, Backus renewed his request to work in the labor and delivery section of the OB–GYN department. He was refused his request on January 5, 1979, on the basis that the hospital "did not employ male R.N.'s in the OB–GYN positions because of the concern of our female patients for privacy and personal dignity which make it impossible for a male employee to perform the duties of this position effectively."

On June 15, 1979, Backus filed a timely charge of discrimination based upon sex with the Equal Employment Opportunity Commission (EEOC) alleging that the hospital's refusal to transfer him to the labor and delivery section of the OB–GYN department was discriminatorily based on sex

and was not a bona fide occupational qualification. The defendant continued to refuse to assign Backus to the labor and delivery section of the OB–GYN department until he left the hospital in September 1979.

Plaintiff also contends that from the time that he filed his charge of discrimination in January he was harassed by supervisory personnel; and that on June 8, 1979, he received a performance evaluation which downgraded him because of the filing of charges.

Another allegation of the complaint is that plaintiff in June 1979 was refused a promotion to the position of team leader because of his filing of charges with EEOC. The position of team leader was eliminated a month later, but plaintiff contends that he would have received a substantial increase in pay if he had received the promotion.

The Court has jurisdiction of this matter pursuant to 42 U.S.C. § 2000e, *et seq.* A timely charge of discrimination was filed. The EEOC issued its right-to-sue letter and plaintiff filed his complaint in this matter within ninety days after receipt of his right-to-sue letter. The Baptist Medical Center is an employer within the meaning of Title VII of the Civil Rights Act of 1964.

42 U.S.C. § 2000e–2(a) requires that an employer, in order to establish sex as a bona fide occupational qualification (BFOQ), must demonstrate that the challenged policy is reasonably related to the essence of its business and that there is a factual basis for believing that it is impossible or impractical to deal with persons on an individual basis. The courts have interpreted this requirement very narrowly. *Dothard v. Rowlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); *Diaz v. Pan American World Airways,* 442 F.2d 385 (5th Cir. 1971), *cert. denied,* 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971).

As a defense to plaintiff's allegations, defendant Baptist Medical Center relies upon its policy of recognizing and respecting the privacy rights of its patients. The

testimony reflected that this policy requires that catheterizations be performed by an individual who is of the same sex as the patient. The Medical Center also provides individualized labor rooms for its patients and restricts nursing positions in the labor and delivery section to females. The latter policy, regarding female nurses in the labor and delivery section, stems from the fact that obstetrics is a unique section of the hospital. An obstetrical patient constantly has her genitalia exposed. There are few duties which a registered nurse can perform in relation to an obstetrical patient which are not sensitive or intimate. Among the duties performed by the nurse in the labor room are the following: checking the cervix for dilation, shaving the perineum, giving an enema, assisting in the expulsion of the enema and sterilizing the vaginal area. In the recovery room the nurse checks the patient for bleeding, gives massages to the uterus, and changes perineal pads.

At Baptist Medical Center obstetrical patients are randomly assigned to a nurse upon admittance to the hospital. This nurse is not selected by the patient and is a stranger to her. The labor and delivery nurses perform intimate functions. Defendant contends that if a male nurse is performing these duties, the patient's constitutional right to privacy is violated. We agree with the defendant.

█ The Court finds merit in defendant's contention that the majority of women patients will object to intimate contact with a member of the opposite sex. Once a patient becomes dissatisfied with a service that the defendant offers, it is probable that the patient will seek future medical care elsewhere. In addition to offending future patients, a male nurse would necessitate the presence of a female nurse to protect the hospital from charges of molestation. This unnecessary duplication of manpower would result in higher salary costs.

Both of these problems, potential customer loss and higher administration costs, would result in an economic injury to the defendant. It is clear that an economic injury is a sufficient "personal stake" to find standing. See *Village of Arlington Heights, et al., v. Metropolitan Housing Development Corp., et al.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

In addition to raising its own rights, Baptist Medical Center has standing to litigate on behalf of its patients. In *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1924), the Court held that a school whose business was being threatened had standing to sue on behalf of its potential clientele. Likewise, Baptist Medical Center's potential business is threatened because its patients will be offended, if plaintiff prevails in this action.

Also, the Court notes that the patients' rights have become intertwined with the rights of the Medical Center due to the professional relationship which exists between them. Both *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1971), and *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1964), recognized that when a close relationship exists, such as doctor-patient or accessory-principal, then the rights become intertwined and the relationship itself entitled one to litigate on behalf of the other.

Those courts coming squarely to deal with this issue have determined that the body involves the most sacred and meaningful of all privacy rights. In *York v. Story,* 324 F.2d 450 (1963), *cert. denied,* 376 U.S. 939, 84 S.Ct. 794, 11 L.Ed.2d 659 (1964), the court stated:

"We cannot conceive of a more basic subject of privacy than the naked body. The desire to shield one's unclothed figure from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity." (324 F.2d at p. 455)

The Ninth Circuit's view of privacy has been applied in several employment discrimination cases analogous to the suit at bar. In *City of Philadelphia v. Pennsylvania Hum. Rel. Comm'n,* 7 Pa.Cmwlth. 500, 300 A.2d 97 (1973), a youth center hired as supervisory personnel only those individuals who were of the same sex as the inmates.

The center adopted this policy due to the contact the supervisors had with the youth, such as monitoring showers and conducting body searches. The court ultimately found a bona fide occupational qualification, and also recognized a constitutional right to privacy. In the opinion the court noted:

> "*Griswold v. Connecticut*, recognizes certain individual rights not specifically enumerated within the Bill of Rights. Having one's body inspected by members of the opposite sex may invade that individual's most fundamental privacy right, the right of privacy of one's own body."

*Id.* 7 Pa.Cmwlth. 500, 300 A.2d at 103 n. 8.

The court was persuaded that intimate contact by those of the opposite sex could cause a "traumatic condition" and "irreparable harm to [a] psyche," *id.*, and concluded:

> "Laws forbidding discrimination in hiring on the basis of sex do not purport to erase all differences between the sexes. These laws recognize that there are jobs for which one sex is inherently and biologically more qualified than those of the opposite sex. The biological difference between men and women which in turn produce psychological differences are the facts that justify limiting personal contact under intimate circumstances to those of the same sex."

*Id.* 7 Pa.Cmwlth. 500, 300 A.2d at 103 n. 7. *City of Philadelphia v. Pennsylvania Hum. Rel. Comm'n., supra.*

Perhaps the most pertinent treatment of the BFOQ was presented in *Fesel v. Masonic Home of Delaware, Inc.*, 447 F.Supp. 1346 (D.Del.1978), aff'd mem., 591 F.2d 1334 (3d Cir. 1979). *Fesel* involved male nurses at a retirement home who had the duty of dressing patients, giving baths, changing pads, administering catheterizations and assisting with toilet use. The court concluded that to meet the BFOQ exception, the home must show that (1) a factual basis existed for believing that women would object to intimate touching by male nurses, and (2) a showing that the schedules of the employees could not be adjusted to avoid the privacy violation. *See id.* at 1350.

The first criteria, a factual basis, was deemed met by the court when the home's administration officials stated their beliefs as to the patients' preferences, when medical personnel offered their opinions, and when some patients themselves testified. As to the second criteria, the court determined that rescheduling could not avoid violations of the patient's privacy rights and, as a result, the BFOQ was applied and the home was allowed to exclude male nurses.

It is important not to confuse the privacy rights recognized in *City of Philadelphia* and in *Fesel* with a mere "customer preference." Whereas a "customer preference" will not justify a job qualification based on sex, an invasion of privacy will. This issue was dealt with in *Fesel* where the court noted:

> "While these attitudes may be characterized as 'customer preference,' this is nevertheless, not the kind of case governed by the regular provision that customer preference alone cannot justify a job qualification based on sex. Here personal privacy interests are implicated which are protected by law and which have to be recognized by the employer in running its business."

*Id.* 447 F.Supp. at 1352.

The distinction between a privacy right and a mere customer preference was also dealt with in A. Larson, Employment Discrimination—Sex § 14.30 (3d Ed. 1980), wherein it was stated:

> "[G]iving respect to deep-seated feeling of personal privacy involving one's own genital area is quite a different matter from catering to the desire of some male airline passenger to have . . . an attractive stewardess. The correct simulation of this type of case is to the personal restroom attendant example. After all, one could with equal logic say that the decision not to be stared at by a member of the opposite sex while urinating is only a matter of customer preference. Indeed the degree of invasion of personal privacy is far greater in the hospital case. The hospital attendant not only has to replace

and remove bedpans, but, if the patient is weak enough, may also have to bathe the genital regions. It would be a strange doctrine that would decree that the sanctity of the right to privacy in the performance of excretory functions, fully respected in a public restroom, is forfeited by the fact of falling ill and becoming hospitalized. It is no answer to say that the necessity for prudery to give way to medical necessity has always been recognized, even in Victorian times, so far as doctors themselves are concerned. The reason, of course, is that the patient knows and accepts the fact of this necessity; if all female patients demanded female surgeons, obstetricians, gynecologists, and the like, a lot of them would go untreated. The same could not be said of their insistence on female attendants, who may or may not even be nurses, for such unskilled tasks as handling bedpans and giving baths.

"It is necessary at this point to stress that the *purpose of the sex provisions of the Civil Rights Act is to eliminate sex discrimination in employment, not to make over the accepted mores and personal sensitivities of the American people* in the more uninhibited image favored by any particular commission or court or commentator." [Emphasis added.]

The principles articulated in *City of Philadelphia* and in *Fesel* justify the policy of defendant of not hiring male nurses in labor and delivery. It is also necessary in applying the BFOQ exception for the defendant to demonstrate that "all or substantially all" men would be inappropriate for the position. See *Weeks v. Southern Bell Telephone & Telegraph*, 408 F.2d 228 (5th Cir. 1969).

Due to the intimate touching required in labor and delivery, services of all male nurses are inappropriate. Male nurses are not inadequate due to some trait equated with their sex; rather, it is their very sex itself which makes all male nurses unacceptable. This was alluded to in *City of Philadelphia*, wherein the court held that "*sexual characteristics*, rather than characteristics that might, to one degree or another, correlate with a particular sex, must be the basis for the application of the BFOQ exception." 7 Pa.Cmwlth. 500, 300 A.2d at 102.

In a similar setting, *Iowa Dept. of Soc. Serv. v. Iowa Merit Emp. Dept.*, 261 N.W.2d 161 (Iowa 1977), involved a men's reformatory in which guards watched the inmates bathe and conducted pat downs. The court recognized the "constitutional right to privacy," *id.* at 164, and held: "[I]t is apparent, and is undisputed, there would be a constitutional violation of inmates' rights if the guards were women ... [C]ontinuous surveillance by one of the opposite sex violates a right of personal privacy." *Id.* at 165.

In another youth detention case, *In re Long*, 127 Cal.Rptr. 732 (Cal.App.1976), in which guards maintained a constant watch over inmates, the court found that intimate exposures were in clear conflict with the guarantees found within the Bill of Rights and held:

"Thus, an accretion of decisional law recognizes that privacy, in both its tort and constitutional manifestations, encompasses the individual's regard for his own dignity; his resistance to humiliation and embarrassment; his privilege against unwarranted exposure of his nude body and bodily functions. The latter kind of exposure assumes particular poignance when it occurs within the preceptive range of strangers of the opposite sex. At that point the exposure clashes with a deeply held social, moral and emotional bias pervading western culture."

*Id.* at 736.

In this area of the law the courts focus not on the employee's competence, but rather on the obvious bodily intrusions which will result. The fact that the plaintiff is a health care professional does not eliminate the fact that he is an *unselected individual* who is intruding on the obstetrical patient's right to privacy. The male nurse's situation is not analogous to that of the male doctor *who has been selected* by the patient.

It follows that requiring labor and delivery nurses to be female is a bona fide

occupational qualification (BFOQ) which is "reasonably necessary to the normal operation of [its] particular business or enterprise."

42 U.S.C. § 2000e, *et seq.*, prohibits discrimination in employment. 42 U.S.C. § 2000e-2 provides, however, that: "notwithstanding any other provision of this title [42 U.S.C. § 2000e, *et seq.*), (1) it shall not be an unlawful employment practice for an employer to hire employees . . . on the basis of . . . sex . . . where . . . sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise . . . "

The services provided by nurses in labor and delivery are of the utmost sensitivity. The legislative history of the act suggests the BFOQ exception is appropriate in this case. Quoting from the Congressional Record, we note:

"There are so many instances where the matter of sex is a bona fide occupational qualification. For instance, I think of an elderly woman who wants a female nurse. There are many things of this nature which are bona fide occupational qualifications, and it seems to me they would be properly considered here as an exception." 110 Cong.Rec. 2718 (1964).

The Baptist Medical Center presented the following evidence:

1. Linda Clinton, who delivered two babies at Baptist Medical Center, testified that she could not accept a male nurse.

2. Plaintiff's witness, Mr. McCluen, acknowledged that some percentage of patients would object to a male nurse.

3. Dr. Marsha Howell testified that one-half of her patients would object to a male nurse and even a greater percentage of their husbands would object. Dr. Howell stated that she herself would object to a male nurse.

4. Dr. Ormon W. Simmons testified that a majority of his patients would object to a male nurse, and he stated that one of his obstetrical patients was treated by plaintiff, Gregory Backus, and objected to his care.

5. Bea Eversdyke, the evening unit supervisor of Baptist's labor and delivery section, testified that patients object to male student nurses but do not object to female student nurses. This witness further testified that she believed that the majority of her patients would object to a male registered nurse in labor and delivery. Ms. Eversdyke testified that she personally would object to a male nurse.

6. Hagar Sam, a registered nurse at Baptist, who has taught LaMaze techniques to approximately 2,000 women who delivered at Baptist, testified that 99¾ percent of her patients would object to a male nurse. Ms. Sam further testified that she would object to a male nurse.

7. Joyce Landers, R.N., testified that she personally would object to a male nurse and that her patients would object to a male nurse. Ms. Landers was personally involved in the investigation which was lodged after a female patient objected to treatment by the plaintiff.

8. Ann Parchman, R.N., former Nursing Director of Obstetrics at Baptist, testified that she personally would object to a male nurse and that her patients would object to a male nurse.

9. Susan Dowling, R.N., current Nursing Director, testified that she personally would object to a male nurse and that her patients would object to a male nurse.

10. Sandy Wisener, R.N., Assistant Administrator at Baptist Medical Center, testified that she personally would object to a male nurse and that her patients would object to a male nurse.

In light of the above, the Court finds that *Baptist Medical Center* furnished sufficient evidence to create a factual basis for believing that a male nurse would be objectionable to obstetrical patients.[1]

---

1. In reaching its decision, the Court recognizes that the issues involved herein are sharply disputed, and careful consideration has been given to the evidence presented during the two-day trial in support of plaintiff's position. The deposition of Dr. Maxwell Baldwin introduced in

Another requirement of *Fesel* is a demonstration that the patient's objections cannot be scheduled around. In this regard, it is clear that defendant could not assign male nurses to perform certain non-intimate duties in labor and delivery because *most* of the duties involve the exposure of the patient's genitalia. Susan Dowling, R.N., the Nursing Director at Baptist who is responsible for organizing the nursing schedules, testified that insurmountable problems would occur. Plaintiff has alleged that Susan Dowling's conclusion is questionable merely because she did not record her determination in writing. *Fesel*, however, did not require empirical documentation.

The staffing problems which will follow from patient objections are also magnified because some doctors, such as Marsha Howell, will request that no male nurse ever be assigned to *any* of their patients. If Baptist Medical Center were required to assign male nurses to labor and delivery, it would affect the quality of health care. The testimony was undisputed that continuity of nursing care is a desirable goal. At Baptist a nurse is assigned to accompany a patient throughout the entire birth process. If a patient objects to male nurse, it will necessitate pulling a female nurse away from her current patient to accompany the objecting patient. This destroys the continuity of care. There is, of course, the possibility that nursing personnel may be changed at shifts, but the more breaks in the chain, the less efficient the health care. Consequently, placing a male in the labor and delivery section would result in a lower quality of care in some cases.

An additional scheduling problem arises in the form of duplicative staffing. Baptist follows a policy which is geared toward protecting the health care professional from a charge of impropriety. Whenever a patient's genital area is examined by a person of the opposite sex, a third person or chaperon will accompany the examiner to curb any risk of a molestation charge. The chaperon policy is, as Dr. Simmons testified,

required in medical school and, as plaintiff's witness Margaret Hamilton testified, taught to nursing students as well. This practice is followed quite consistently at Baptist Medical Center. Dr. Marsha Howell testified that she always has a chaperon present, and Dr. Simmons testified that he has a chaperon 90 percent of the time. As a result, a male nurse would require the presence of a second nurse to chaperon him when he examines a patient in the labor and delivery section. Susan Dowling testified that this would cause unmanageable staffing problems.

Plaintiff has sought to justify the patients' privacy violations by relying on *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C.Cir.1973). *Sibley* is of questionable precedence since it was reversed and remanded by the Court of Appeals and we have no further report on any trial proceedings. In any event, the case is distinguishable for *Sibley* involved a hospital which refused to allow a male nurse to work not only in intimate areas but in *any* capacity. Baptist Medical Center does not follow an absolute prohibition as was done in the *Sibley* case. In fact, the only area in which defendant seeks to limit male nurses is the labor and delivery section. Defendant offered to place plaintiff in other sections of the hospital but the offer was refused even though the pay and opportunities for advancement were equal to those in the labor and delivery section.

The Court finds no merit in plaintiff's contention that his evaluation was downgraded because he filed charges with the EEOC. In the latter part of January 1979, plaintiff filed a complaint with the EEOC. In June 1979, or some five months after the claim with the EEOC was filed, defendant followed its standard procedure of reviewing its nurses. This practice is carried out regularly and is intended to serve as constructive criticism and form a basis for improvement. Plaintiff was evaluated by Sandy Wisener, defendant's Assistant Administrator responsible for nurs-

plaintiff's behalf was also reviewed in depth. However, the Court finds the factual evidence presented by the defendant Medical Center to

be more convincing than that of plaintiff Backus.

ing, and was rated at 3.4 on a scale of 0 to 5. This rating is between satisfactory and high satisfactory. Plaintiff complained about his score and thereafter Ann Parchman, defendant's Nursing Director of Obstetrics, personally reviewed the evaluation and concurred in the result. There was no evidence that the evaluation was influenced by the filing of the charge. The Court notes this rating was sufficient for plaintiff to receive a raise in pay.

▮ Neither does the Court find any merit in the plaintiff's contention that he was refused the promotion to team leader because of discriminatory reasons. After careful consideration, plaintiff's application was denied. Sandy Wisener testified that defendant had a policy of only moving experienced nurses, with at least two years of practice behind them, into a team leader position. The plaintiff had less than a year's experience as a registered nurse at the time he applied. There have been rare occasions when an individual so excels in medicine that the two-year requirement is waived. Gregory Backus, although a satisfactory employee, was not such an individual.

## CONCLUSION

In this case defendant has introduced sufficient factual evidence to convince the Court that the actions questioned herein were based upon legitimate nondiscriminatory business reasons. The duplicative staffing problems create a business necessity for refusing to permit male nurses to work in the labor and delivery section. Baptist Medical Center's chaperon policy would require a second nurse to be present whenever a male nurse attends to a patient in the labor and delivery section. Consequently, a job that required only one nurse will now require two, and this will cause a strain on the nursing staff, will increase the hospital's costs, and will reduce the hospital's efficiency.

In *Texas Dept. of Community Affairs v. Burdine,* 445 U.S. 911, 101 S.Ct. 1089, 63

**2.** In the *Burdine* decision, the U.S. Supreme Court again reaffirmed its adherence to the principles enunciated in the case of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct.

L.Ed.2d 326 (1981),[2] the U.S. Supreme Court reversed the Fifth Circuit Court of Appeals for holding that the defendant in a Title VII case bears the burden of proving by a preponderance of the evidence the existence of legitimate nondiscriminatory reasons for the employment action. The court stated:

"When the plaintiff has proved a prima facie case of discrimination, the defendant bears only the burden of explaining clearly the nondiscriminatory reasons for its action."

Defendant Baptist Medical Center has more than met this burden and plaintiff has failed to show that the reasons articulated by the defendant are mere pretexts.

Plaintiff's complaint is hereby dismissed with prejudice.

1817, 36 L.Ed.2d 668 (1973). In considering the case at hand, this Court has followed these principles.