**Victor Glenn CLARK, Plaintiff,**

v.

**Laura TINNIN and the City and County of Denver, Defendants.**

No. 87–C–1216.

United States District Court, D. Colorado.

March 1, 1990.

David Lane, Denver, Colo., for plaintiff.

Theodore Halaby, Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

CARRIGAN, District Judge.

Plaintiff, Victor Glenn Clark, filed this *pro se* civil rights suit after certain hair samples were taken from him by a female police officer pursuant to an April 1987 state court order. At the time, the plaintiff had been arrested on first degree sexual assault charges and was a pretrial jail detainee in the City and County of Denver, Colorado. Named as defendants were the Denver Police Department and one of its officers, Laura Tinnin.

I declined to dismiss this action on the Magistrate's recommendation and appointed counsel to represent the plaintiff. Upon the parties' stipulation, I dismissed the

complaint and action against the Denver Police Department.

On May 23, 1988, the plaintiff filed an amended civil rights complaint asserting a federal claim under 42 U.S.C. § 1983 for violation of the First and Fourth Amendments to the United States Constitution, together with state law claims for intentional infliction of emotional distress and invasion of privacy. In addition to the defendant Tinnin, the City and County of Denver, Colorado, has been named as a defendant.

Defendants have filed a motion for summary judgment in which they argue (1) that the defendant Tinnin is protected by qualified immunity; (2) that the undisputed facts do not sustain the alleged constitutional violations; (3) that the state law claims should be dismissed because the plaintiff failed to give appropriate statutory notice; and (4) that this court should decline to exercise pendent jurisdiction over the state law claims. Plaintiff has responded by opposing the motion.

The parties have fully briefed the issues and oral argument would not assist my decision. Jurisdiction is based on 28 U.S.C. §§ 1331 and 1343, and pendent jurisdiction.

## I. *Factual Discussion.*

On April 12, 1987, the plaintiff was arrested on a charge of first degree sexual assault that allegedly occurred in the City and County of Denver, Colorado. Defendant Tinnin, a Denver police detective who had worked in the Sex Assault Unit since 1981, was assigned to investigate the case.

On April 13, 1987, the State filed a motion in its state court criminal case seeking non-testimonial identification evidence from Clark. Attached to that motion was the defendant Tinnin's affidavit indicating that the female victim had stated that penetration had occurred during the alleged sexual assault.

That same day, state district Judge G.A. Mueller issued an order finding probable cause to believe that the plaintiff had committed the offense of sexual assault. Judge Mueller further ordered "Det. Laura M. Tinnin 74–17, or any officer of the Denver Police Department, ..." to perform "specific non-testimonial identification procedures" involving "blood, hair and saliva," pursuant to Rule 41.1, Colo.R.Crim.P.

In an effort to execute the court's order, the defendant Tinnin contacted the plaintiff at the Denver City Jail. Regarding the taking of pubic hair samples by the defendant Tinnin, the plaintiff alleges in his civil rights complaint here that:

"4. ... Plaintiff was forced by detective Tinnin to expose his genitals to her while he obtained a sample of his pubic hair. This action was undertaken by the female detective, even though several male officers were available to supervise the taking of the pubic hair sample. Detective Tinnin refused to allow Plaintiff an opportunity to cover his genitals, asserting that she had to be certain that the hair taken by Plaintiff came from the pubic region. She then threatened that she would take it herself if Plaintiff refused to cooperate."

Plaintiff's discovery deposition has been attached as an exhibit to the defendants' summary judgment motion. Plaintiff was represented by counsel during the deposition.

In his deposition, the plaintiff stated that he was sitting alone in his jail cell when the defendant Tinnin, accompanied by a male officer from the Sheriff's office, told him that she had a court order to take body samples. Plaintiff was escorted to the nurse's station by the defendant Tinnin and the male officer. Another male officer was present at the nurse's station when they arrived. While at the nurse's station, the plaintiff asked to see the court order. Defendant Tinnin explained the order to him, stating that she would be taking some blood and hair samples. Plaintiff was permitted to read the court order.

Plaintiff testified that before the blood sample was taken, he asked the defendant Tinnin "What if I don't want to give it?" According to the plaintiff, she replied, "Well, we'll hold you down and I'll take it." Plaintiff stated that he voluntarily submitted to the blood sample and the blood was drawn by the male nurse on duty.

After the blood was taken, the defendant Tinnin told the plaintiff to go into an inner room located within the nurse's station, which he did. Plaintiff stated that the two male sheriff's deputies were standing outside the door and that they were watching what was going on.

Plaintiff seated himself on the examining table in the inner room of the nurse's station. He then pulled some hair samples from his head and chest and placed them in plastic bags.

Defendant Tinnin then advised the plaintiff that she needed some pubic hair samples. I quote at length from the plaintiff's deposition regarding his description of the procedure utilized in taking these samples:

"Q. Then after the chest hairs are collected, what happens next?"

"A. Then she wanted pubic hair."

\* \* \* \* \* \*

"Q. What do you recall about her precise words?"

"A. 'I need some pubic hair in this bag. You can pull your pants down and give it to me, or I can get it.'"

\* \* \* \* \* \*

"Q. Did you say anything in response?"

"A. I don't think so."

"Q. What did you do?"

"A. There was two of them outside, and I was kind of scared to say a whole lot."

"Q. You're speaking of the sheriff's officers?"

"A. Deputies. Yes, they don't—sometimes they're not real nice to you."

"Q. ... So you didn't say anything after she told you this?"

\* \* \* \* \* \*

"A. Yes. I remember asking her if I could turn sideways, and she said no, she had to make sure that it came from the right area—the same area, instead of up high."

"Q. What do you recall about the precise words you used in asking her this?" [Plaintiff's November 22, 1988 deposition at 42–43].

"A. I said—I'm pretty sure I said, 'Can I turn sideways?' And she said, 'No, I have to see where it comes from to make sure it comes from the pubic region,' or something like that."

"Q. Now, how were you dressed at that time?"

"A. Let's see. I've got on a green shirt they gave me and a white pair of pants that they gave me." [Plaintiff's November 22, 1988 deposition at 43–44].

\* \* \* \* \* \*

"Q. So at the time you're saying Detective Tinnin told you that after you asked her if you could turn to the side, are you sitting or standing?"

"A. Standing."

"Q. ... What did you do?"

"A. I pulled a hair and gave it to her. It was either that or them hold me down and do it."

"Q. Them? Who is 'them'?"

"A. Well, she said if I didn't give it, then they would hold me down and they would take it."

\* \* \* \* \* \*

"Q. When did she tell you that?"

"A. When we first got there."

"Q. Before the blood was collected?"

"A. Right." [Plaintiff's November 22, 1988 deposition at 45].

"Q. So you unfastened the button and unzipped the trousers?"

"A. Yes, ma'am."

"Q. Then what did you do?"

"A. I had to push them down a little bit so I could get to the pubic hair, which kind of exposed me a little. And she had to make sure that it came from the genital region or the pubic hair region or whatever, that was her—that's what she told me."

\* \* \* \* \* \*

"Q. So where were you facing at the time?"

"A. Toward the door."

"Q. And where was she standing?"

"A. In front of the door."

"Q. ... Would you say your orientation to Detective Tinnin was ... face to face?"

"A. Pretty close, yes."

"Q. And both of you were standing at that time?"

"A. Yes."

*    *    *    *    *    *

"Q. And you say you were a little bit exposed. How much exposed were you?"

"A. Well, I wasn't—my pants weren't down to my knees, but they were down." [Plaintiff's November 22, 1988 deposition at 48–49].

"Q. How far down."

"A. Down far enough so she could see where the hair came from."

"Q. ... So you're saying your groin region was exposed?"

"A. Yes."

"Q. Was your penis exposed?"

"A. Partly."

"Q. Were your testicles exposed?"

"A. No."

"Q. How much of your penis was exposed?"

"A. I don't remember."

"Q. Are we talking about the top part?"

"A. A little more. About half."

"Q. ... And how many hairs did you pull?"

"A. Eight or ten, I think. I didn't really count them...."

*    *    *    *    *    *

"Q. ... How far away is she standing from you at that time?"

"A. Four feet maybe." [Plaintiff's November 22, 1988 deposition at 50].

*    *    *    *    *    *

"Q. But you don't remember if your testicles were exposed?"

"A. No, I don't.... I don't think my pants were that low. I don't remember, but I don't think so."

[Plaintiff's November 22, 1988 at 51].

*    *    *    *    *    *

"Q. Did you have any discussion with Detective Tinnin at the time you were pulling the pubic samples?"

*    *    *    *    *    *

"A. I don't remember. I don't think so. I think I asked if we could get a male officer or somebody to take the samples, but I'm not—I'm pretty sure I did, yes." [Plaintiff's November 22, 1988 deposition at 53–54].

*    *    *    *    *    *

"Q. What did she say?"

"A. She said, 'No, you'll have to give them to me.'" [Plaintiff's November 22, 1988 deposition at 55].

*    *    *    *    *    *

"Q. And then did you leave the room?"

"A. Yes."

"Q. Where did you go then?"

"A. Back to my cell."

"Q. Who took you?"

"A. I think it was one of the male deputies." [Plaintiff's November 22, 1988 deposition at 57].

For purposes of the defendants' summary judgment motion, I have accepted as true the plaintiff's statements contained in his discovery deposition.

In an affidavit attached to the defendants' summary judgment motion, the defendant Tinnin acknowledges that she did not substitute a male officer to collect the pubic hair samples. Had she done so, that procedure would have extended the chain of evidence and increased the number of witnesses at trial. In addition, if the male officer later became unavailable for trial, the chain of evidence would be placed at risk.

On October 27, 1987, the City Attorney's office for the City and County of Denver received a notice from the plaintiff regarding claims that might be filed. The notice, dated October 26, 1987, stated as follows:
  "Sir:"

"This is my notice to your office of my intent to sue the City and County of Denver; Denver, Colorado. This claim is for false arrest, false imprisonment, physical and mental anguish, and for actions against my personal privacy."

"I was arrested on April 12, 1987. The victim has been lieing (sic) since that time. My case no. is 87CR921. This law suit will be in the amount of $500,000.00 (five hundred thousand dollars)."

"This letter is sent pursuant to C.R.S. 24–10–109."

The letter was signed: "Sincerely, Victor Clark, 54221, P.O. Box 1010, Canon City, Colorado 81212."

II. *Legal Discussion and Conclusions.*

Under Rule 56(c), Fed.R.Civ.P., summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." A summary judgment motion that points out the absence of factual support for an essential element of the challenged claim shifts the burden to the nonmoving party to show that there is proof of the necessary facts. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Accordingly, when one party moving for summary judgment has carried its burden of demonstrating the absence of a genuine issue of material fact, the "nonmoving party must come forward with 'specified facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The nonmovant's burden is not satisfied by showing that there is some "metaphysical doubt as to material facts." *Id.* at 1356. Instead, the nonmovant must show that the record could support a finding by a "rational trier of fact" in favor of the nonmovant. *Id.*

A. Defendants' Motion for Summary Judgment Regarding the Plaintiff's Constitutional Claims.

To prevail on a claim asserted under § 1983, the plaintiff must establish (1) a deprivation of a right secured by the Constitution and (2) the deprivation of that right by persons "acting under color of state law." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970).

As I read the amended civil rights complaint, the plaintiff contends that his First Amendment right of privacy and his Fourth Amendment right to be free from unreasonable searches have been violated. Plaintiff bases his constitutional claims on the fact that the officer who obtained pubic hair samples from him was female. In moving for summary judgment on these claims, the defendant Tinnin contends that she is protected by qualified immunity. Defendant City and County of Denver asserts that no constitutional violations occurred.

"Qualified immunity," means that "government officials performing discretionary functions ... are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). *See Davis v. Scherer,* 468 U.S. 183, 194 n. 12, 104 S.Ct. 3012, 3019 n. 12, 82 L.Ed.2d 139 (1984) (immunity standard of *Harlow* applies in § 1983 actions).

When a defendant raises the affirmative defense of qualified immunity, the plaintiff bears the burden of convincing the court that the asserted federal constitutional or statutory rights were clearly established at the time the challenged conduct took place. *Lutz v. Weld County School Dist. No. 6,* 784 F.2d 340, 342–43 (10th Cir.1986). Plaintiff bears the additional burden of demonstrating how the defendant's conduct violated such clearly established law. *Pueblo Neighborhood Health Centers, Inc. v. Losavio,* 847 F.2d 642, 646 (10th Cir.1988). Where the plaintiff fails to meet that standard, the court is required to enter judgment in favor of the defendants who have properly pleaded the immunity defense. *Lutz,* 784 F.2d at 343.

Since the defendant Tinnin has asserted the qualified immunity defense, I must determine whether the federal rights claimed to have been violated were clearly established at the time of the acts in question. In *Eastwood v. Department of Corrections of the State of Okla.*, 846 F.2d 627 (10th Cir.1988), the Court of Appeals for the Tenth Circuit recently discussed the plaintiff's burden of demonstrating the unlawfulness of an official's actions in light of preexisting case law in order to recover under § 1983. The court there stated:

"[t]he particular action in question, however, need not have previously been held unlawful. *Anderson v. Creighton*, [483] U.S. [635], 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Nor must there even be a strict factual correspondence between the cases establishing the law and the case at hand. *E.g., Garcia by Garcia v. Miera*, 817 F.2d 650, 657 (10th Cir.1987), *cert. denied*, [485] U.S. [959], 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988). Rather, this circuit requires only 'some but not precise factual correspondence.' *Id.* (quoting *People of Three Mile Island v. Nuclear Regulatory Comm'rs*, 747 F.2d 139, 144 (3d Cir.1984)). It is incumbent upon the government officials 'to relate established law to analogous factual settings.' *Id.*" *Eastwood*, 846 F.2d at 630.

No "right of privacy" is expressly guaranteed by the Constitution. However, the United State Supreme Court has recognized that "zones of privacy" exist by virtue of other, general constitutional guarantees. *See Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). A prisoner's claims of privacy right violations such as those here asserted are best analyzed under the Fourth Amendment's guarantee of an expectation of privacy against unreasonable searches and seizures. *See Grummett v. Rushen*, 779 F.2d 491, 493 n. 1 (9th Cir.1985), *citing generally Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

In *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the United States Supreme Court held that the Fourth Amendment was not violated by taking blood samples to test a person's blood alcohol content where there was probable cause for the arrest and reasonable means and procedures were employed. The Supreme Court there noted that "[t]he overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Id.* at 767, 86 S.Ct. at 1834.

More than ten years later, in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court considered whether confinement conditions and certain practices and procedures at a New York pretrial detention facility were constitutional. Emphasizing that searches must be conducted in a reasonable manner, the Court determined that visual body cavity searches of pretrial detainees could be conducted without first meeting the probable cause standard. There the Court declared:

"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. (citations omitted)." *Id.* at 559, 99 S.Ct. at 1884.

In analyzing the plaintiff's privacy right under the Fourth Amendment, it is important to note that the instant case concerns a pretrial detainee and not a convicted person. With respect to the latter, *Bell v. Wolfish, supra*, indicates that although convicted persons are not entitled to the full protection of the Constitution, they do not forfeit all protected rights as a result of conviction and prison confinement. *Bell*, 441 U.S. at 545, 99 S.Ct. at 1877. A convicted inmate's privacy right must yield to the penal institution's need to maintain security. That privacy right, however, does not vanish completely upon post con-

viction incarceration. *Cumbey v. Mea-chum,* 684 F.2d 712, 714 (10th Cir.1982).

In *Cumbey,* the plaintiff, incarcerated in the Joseph Harp Correctional Center in Lexington, Oklahoma, alleged that his civil rights were being violated because female prison guards were assigned to posts where they could observe him dressing and undressing, using the toilet, and shower-ing. The Court of Appeals for the Tenth Circuit, citing several cases from other jur-isdictions, held that the district court had erred in dismissing the § 1983 complaint as frivolous.

In *Grummett v. Rushen,* 779 F.2d 491 (9th Cir.1985), San Quentin prison inmates filed a class action asserting that prison policy and practice allowing female guards to view male inmates in a state of partial or total nudity violated their protected privacy rights. In considering the issue of female guards conducting pat-down searches of male inmates' groin areas, the Ninth Cir-cuit reasoned, however, that the searches did not involve intimate bodily contact. In addition the court concluded from the record that the female guards had conduct-ed themselves in a professional manner. After recognizing the state's legitimate in-terest in searching and surveilling prison-ers in order to maintain security, the appel-late court concluded that prison authorities had devised the least intrusive means avail-able to serve those interests. *Id.* at 494. *But compare Michenfelder v. Sumner,* 860 F.2d 328 (9th Cir.1988) which indicates that a "rational relationship" test has re-placed the "least intrusive means" test in analyzing privacy rights of convicted in-mates, *citing Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

As I previously stated, the rights of a pretrial detainee who stands unconvicted of a crime are here at issue. *Fisher v. Wash-ington Metro. Area Transit Auth.,* 690 F.2d 1133 (4th Cir.1982), indicates that a pretrial detainees' "protectible rights of privacy under the due process clauses are necessarily more substantial in general than are those of convicted inmates." *Id.* at 1142. *Bell v. Wolfish, supra,* further supports this conclusion.

In *Fisher,* the clothing of a female pre-trial detainee had been removed when she feigned a suicide attempt in her cell. She sued under § 1983 claiming that her right of privacy had been violated because the conditions of her confinement permitted male guards and inmates to view her in a state of undress. The Court of Appeals for the Fourth Circuit stated that exposure of an inmate's genitals in the presence of the opposite sex, when not reasonably neces-sary in maintaining an otherwise legal de-tention, may constitute a violation of con-stitutionally protected rights for which a § 1983 action can be maintained. *Id.* at 1142.

Similarly, in a much earlier case, *York v. Story,* 324 F.2d 450 (9th Cir.1963), *cert. denied sub nom.* 376 U.S. 939, 84 S.Ct. 794, 11 L.Ed.2d 659 (1964), the plaintiff York, who had gone to the Chino, California po-lice station to report an assault, had been photographed nude and in suggestive poses by a male officer. The photographs later were circulated among police personnel. In holding that the plaintiff's complaint stated a civil rights claim under § 1983, the Ninth Circuit Court of Appeals stated:

"We cannot conceive of a more basic subject of privacy than the naked body. The desire to shield one's unclothed fig-ure from view of strangers, and particu-larly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity...."

"Nor can we imagine a more arbitrary police intrusion upon the security of that privacy than for a male police officer to unnecessarily photograph the nude body of a female citizen who has made com-plaint of an assault upon her, over her protest that the photographs would show no injuries, and at a time when a female police officer could have been, but was not, called in for this purpose, and to distribute those photographs to other personnel of the police department de-spite the fact that such distribution of the photographs could not have aided in apprehending the person who perpetrat-ed the assault." *Id.* at 455.

■ Against this case law background, it can be concluded that a pretrial detainee has substantial Fourth Amendment rights of privacy and freedom from unreasonable searches. These rights may yield, however, as reasonably necessary to maintain a pretrial detainee's legal confinement.

■ The State's need for a particular search must be weighed against the invasion of a detainee's personal rights of privacy and dignity. The test of whether a particular search is reasonable requires a four-factor analysis of the intrusive act: (1) the scope of the particular intrusion; (2) the manner in which it is conducted; (3) the justification for initiating it; and (4) the place where it is conducted.

It is undisputed that in April 1987, the male plaintiff was arrested for first degree sexual assault allegedly perpetrated on a female victim. Defendant Tinnin, a female detective, who at that time was a six-year veteran of the Denver police department's Sex Assault Unit, was assigned to the case. Based on her affidavit indicating that the victim had stated that penetration had occurred, the state district judge ordered the defendant Tinnin, or some other Denver police officer, to collect blood and hair samples from the plaintiff.

Pursuant to her duties as a police officer, the defendant Tinnin proceeded to execute the order at the nurse's station of the Denver City Jail. Defendant Tinnin, a female, was accompanied by two male sheriff's deputies. The male nurse on duty obtained the plaintiff's blood samples.

Based on these undisputed facts, I conclude that there was ample justification for the particular search involving the plaintiff and that it had been judicially authorized. The scope of the search was limited to blood and hair samples, both relevant to the victim's statement that penetration had occurred during the alleged sexual assault. The search was conducted in the privacy of the nurse's station. I thus conclude that the undisputed facts establish a proper scope and place for the search.

The remaining question concerns the manner in which the search was conducted. Plaintiff's civil rights complaint makes no claim regarding the blood, head or chest hair samples. I thus must determine whether the manner in which the pubic hair samples were collected violated the Fourth Amendment.

At the risk of redundancy, it would be helpful to recapitulate the facts for comparison with the facts of precedent cases. As stated, the court's order authorized the female defendant Tinnin, or some other police officer, to conduct the search of the male defendant. The evidence is undisputed that two sheriff's deputies and a male nurse were on hand when the pubic hair samples were collected by the defendant Tinnin. Defendant Tinnin states in her affidavit that as the investigating officer, she conducted the search in order to preserve the chain of custody and limit the number of witnesses needed for trial. According to the plaintiff, he was required to lower his pants and expose the top half of his penis in the presence of the defendant Tinnin. Plaintiff does not assert that his testicles were exposed. He was not, however, permitted to turn sideways because the defendant Tinnin stated that she needed to see the area from which the pubic hair was retrieved. Plaintiff then pulled some of his own pubic hairs and placed them in a plastic sack held by the defendant Tinnin who was standing about four feet away.

In analyzing the facts, I have compared the instant action with *Bouse v. Bussey,* 573 F.2d 548 (9th Cir.1977). There Bouse filed a civil rights suit after pubic hair samples were forcibly taken from him by a *male* Oregon state police officer. At the time, Bouse was incarcerated in the county jail of Crook County, Oregon on a rape charge. When Bouse refused the officer's demand for a pubic hair sample, the officer, assisted by another officer, unzipped Bouse's jail uniform and forcibly pulled the hairs. This search was conducted without a warrant.

The Ninth Circuit Court of Appeals determined that Bouse had alleged a cognizable constitutional claim because he had been "subjected to a painful and humiliating invasion upon the most intimate parts of his anatomy...." *Id.* at 550. The ap-

pellate court held that the search appeared defective because it was not supported by a search warrant and constituted an invasion of personal privacy.

█ The issue before me is whether a *female* police officer, acting pursuant to a valid court order, may obtain pubic hair samples from a male pretrial detainee arrested for first degree sexual assault and observe him taking the hair sample. Here it is not claimed that the plaintiff was held down or otherwise physically restrained or that the officer was emotionally or physically abusive. Plaintiff was asked to expose himself only to the extent necessary for the defendant Tinnin to observe the area from which the hair sample was being taken.

I conclude that no case law supports the plaintiff's assertions that the defendant Tinnin's actions violated "clearly established" constitutional or statutory rights. No instance has been cited where a female defendant has been held liable under § 1983 in any case that possesses "some factual correspondence" to the alleged actions of the defendant Tinnin. I thus conclude that the defendant Tinnin is qualifiedly immune from liability and that the defendants' summary judgment motion on this issue is granted.

In reaching my decision, I have reviewed the many cases cited by the plaintiff that deal with the rights of health care employees to jobs involving intimate contact with members of the opposite sex. For example, in *Backus v. Baptist Medical Center*, 510 F.Supp. 1191, *vacated as moot* 671 F.2d 1100 (8th Cir.1982), (E.D.Ark.1981), a male nurse sued under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, after denial of his application to work in the labor and delivery section of the Baptist Medical Center's obstetrics and gynecology department in Little Rock, Arkansas. The federal district court concluded that this employment action was based on nondiscriminatory business reasons, stating in part as follows:

"In this area of the law the courts focus not on the employee's competence, but rather on the obvious bodily intrusions which will result. The fact that the plaintiff is a health care professional does not eliminate the fact that he is an *unselected individual* who is intruding on the obstetrical patient's right to privacy. The male nurse's situation is not analogous to that of the male doctor *who has been selected* by the patient." *Id.* at 1195.

With respect to the instant suit, I am concerned solely about the possible violation of the plaintiff's Fourth Amendment rights as a pretrial detainee. I have not focused on the defendant Tinnin's Title VII rights against employment discrimination and thus have not weighed in the balance what right the defendant Tinnin, a female, may possess to perform all normal duties of her job in the Denver police department's Sex Assault Unit.

I am somewhat troubled by the fact that the male nurse who drew the blood sample from the plaintiff did not also collect the pubic hair samples. He and two male police officers certainly were readily available. Plaintiff asserts in his amended complaint that permitting female officers to collect pubic hair samples amounts to an unconstitutional policy or practice. I am not convinced that the procedure utilized in this case, insofar as municipal liability is concerned, comports with constitutional standards.

█ Defendant City and County of Denver is not entitled to the defense of qualified immunity. *Owen v. Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980); *Washington v. Starke*, 626 F.Supp. 1149 (W.D.Mich.1986). In the analogous setting involving the privacy rights of convicted persons, the United States Supreme Court has articulated four factors relevant to the determination of whether a prison regulation is reasonable. *See Kent v. Johnson*, 821 F.2d 1220, 1229–1230 (6th Cir.1987), discussing *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) and *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). One factor to be assessed is whether an inmate can point to a ready alternative that would fully accommodate the pris-

oner's rights at *de minimus* cost to valid penological interests. *Turner v. Safley,* 482 U.S. at 91, 107 S.Ct. at 2262.

■ I thus conclude that more factual development is necessary for resolution of whether the defendant City and County of Denver is liable to the plaintiff for maintaining an unconstitutional policy or practice. Defendants' motion for summary judgment as to the defendant City and County of Denver on the plaintiff's § 1983 claim is denied.

### B. Plaintiff's Pendent State Claims.

Plaintiff has asserted state law claims for intentional infliction of emotional distress and invasion of privacy. Defendants have moved for summary judgment on these claims contending that the plaintiff failed to comply with the notice requirement set forth in the Colorado Governmental Immunity Act ("CGIA"), Colo.Rev.Stat. § 24–10–109. Section 24–10–109 provides in pertinent part:

"(1) Any person claiming to have suffered an injury by a public entity or by an employee thereof while in the course of such employment shall file a written notice as provided in this section within one hundred eighty days after the date of the discovery of the injury, regardless of whether the person then knew all of the elements of a claim or a cause of action for such injury. Compliance with the provisions of this section shall be a jurisdictional prerequisite to any action brought under the provisions of this article, and failure of compliance shall forever bar any such action."

"(2) The notice shall contain the following:

(a) The name and address of the claimant and the name and address of his attorney, if any;

(b) A concise statement of the factual basis of the claim, including the date, time, place, and circumstances of the act, omission, or event complained of;

(c) The name and address of any public employee involved, if known;

(d) A concise statement of the nature and the extent of the injury claimed to have been suffered;

(e) A statement of the amount of monetary damages that is being requested."

"(3) If the claim is against the state or an employee thereof, the notice shall be filed with the attorney general. If the claim is against any other public entity or an employee thereof, the notice shall be filed with the governing body of the public entity or the attorney representing the public entity. Such notice shall be effective upon mailing by registered mail or upon personal service."

\*     \*     \*     \*     \*     \*

The CGIA thus requires that a person suffering an injury by a public entity or employee acting within the scope of the employee's employment must file a written notice of the claim within 180 days after discovering the injury. The claim notice must contain a concise statement of the factual basis of the omission or event, including the date, time, place and circumstances. Notice of the claim is effective upon registered mailing or hand delivery. In 1986, the Colorado legislature amended § 24–10–109(1) by deleting the word "substantial" in front of compliance. It thus appears that compliance more strict than substantial is now required.

■ It is undisputed that the plaintiff filed a claim notice that was received by the Denver City Attorney's office October 27, 1987. Defendants first contend that the plaintiff's claim notice was not timely because it was submitted more than 180 days after the alleged incident. The pubic hair samples were collected April 13, 1987. The claim notice thus appears to have been filed twelve days late.

In response, the plaintiff initially states that he was incarcerated during the time in which he was to give notice of his claims and had no meaningful access to an attorney. He additionally states that he "was unaware of any time provisions until the time had expired." Plaintiff's opposition brief filed April 17, 1989 at 11.

Plaintiff has not supported his assertions with an affidavit or other document as required by Rule 56(e) Fed.R.Civ.P. I cannot accept as true the plaintiff's bald statement regarding the reason his claim notice was not timely filed.

By submitting the plaintiff's claim notice received by the Denver City Attorney's office on October 27, 1987, the defendants have established by undisputed facts that the notice was filed beyond the 180 day time period. Defendants thus have satisfied their burden of demonstrating an absence of a genuine issue of material fact on this matter. The burden then shifts to the plaintiff as the nonmoving party to come forward with specific facts showing that there is a genuine issue for trial. Plaintiff simply has failed to satisfy this burden.

I conclude that the plaintiff's claim notice does not comply with the CGIA because it was not filed within 180 days of the incident alleged. Defendants' motion for summary judgment on the plaintiff's state law claims is granted and these claims are dismissed from the amended civil rights complaint and action. Since I have dismissed the state law claims, it is unnecessary for me to consider whether the claim notice was sufficiently specific or whether the court should exercise pendent jurisdiction.

Accordingly, IT IS ORDERED that:

1. Defendants' motion for summary judgment is granted in part and denied in part;

2. Defendant's summary judgment motion regarding the constitutional claims based on First and Fourth Amendment violations is granted as to the defendant Tinnin and those claims as asserted against that defendant are dismissed from the amended civil rights complaint and action;

3. Defendants' summary judgment motion regarding the constitutional claims for First and Fourth Amendment violations asserted against the defendant City and County of Denver, Colorado, is denied;

4. Defendants' summary judgment motion as to the plaintiff's state law claims for intentional infliction of emotional distress and invasion of privacy is granted and those claims are dismissed from the amended civil rights complaint and action; and

5. The parties and their counsel are ordered to meet and confer within eleven days in a good faith effort to settle this case and to report the results of their efforts in writing to the court.